HAL CORDER, Appellant, v. JAMES O'NEILL.

Division Two, December 10, 1907.

1. **COMMISSIONS: Agent to Sell Real Estate: Money From Both Sides.** An agent to sell real estate who accepts a commission from the purchaser cannot recover from the seller the commission which the seller agreed to pay him. An agreement between the agent of the purchaser and the agent of the seller to "pool" and divide their commissions is contrary to public policy and void, and if the agent of the seller enters into such an agreement with the agent of the purchaser, prior to the sale, and thereafter the sale is consummated, without knowledge by the seller of the existence of the agreement, the seller's agent cannot recover from the seller the commission which the seller agreed to pay him. And the fact that the bargain was effected by the principals themselves, in the agent's presence and with his assistance, does not affect the rule.

2. ———: ———: ———: **Pooling: Knowledge.** An agreement between the agent of the seller and the agent of the purchaser by which each was to share in the commissions to be paid by both purchaser and seller, made without the knowledge of the seller, is, on his agent's part, an indirect method of acting as agent for both seller and purchaser, and disqualifies him to render that faithful and disinterested service to his principal which the law demands; and such double agency, without the principal's knowledge and consent, will defeat any recovery of commissions by the agent, whether or not his double dealing resulted in injury to his principal, and whether or not he acted from bad motives, and whether or not he in any wise misrepresented the value and earnings of the property.

3. ———: ———: ———: **Middleman.** And where the agent in his petition charges that he as agent for the seller furnished a buyer at the price agreed upon, and sold the property to the purchaser, and the evidence goes to show that he was present with the purchaser and seller when the sale was made and helped to arrange the terms, if he accepted or had agreed to accept commissions from the purchaser, or to share in the commissions of the purchaser's agent, he was not a mere middleman, and the courts will not indulge in any refined theories to make him a middleman.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

AFFIRMED.

*Thomas & Hackney* for appellant.

(1) Under the facts shown in evidence plaintiff did not forfeit his right to commission from the defendant, nor forfeit his right for damages herein on account of his arrangement with House by which he was to receive a share of the amount paid by the purchaser. It appeared from the evidence that defendant had fixed the price for his property, to-wit, $85,000. By his agent he told the plaintiff that plaintiff must get his compensation from the purchaser and, hence, $5,000 was added to defendant's price for the property, and plaintiff was directed to name the price to the purchaser as $90,000, which he did. Plaintiff then intro-

duced the purchaser to defendant and after bringing them together took no hand in the negotiations, and they made their own bargain and afterwards drew up and signed a contract in his absence. Under such circumstances plaintiff did not forfeit his claim for the compensation from defendant, even though he received compensation from the purchaser in addition to the $5,000 agreed upon between him and defendant. Ranney v. Donovan, 78 Mich. 318; Montross v. Eddy, 94 Mich. 105; Friar v. Smith, 120 Mich. 413; Rupp v. Sampson, 16 Gray 398; Stewart v. Mather, 32 Wis. 344 Barry v. Schmidt, 57 Wis. 174; Orton v. Schofield, 61 Wis. 384; Alvord v. Crook, 174 Mass. 120; Mullen v. Kwelzleb, 7 Bush 253; Knauss v. Brewing Co., 142 N. Y. 70; 23 Am. and Eng. Ency. Law (2 Ed.), 907; Cox v. Hann, 127 Ind. 325. (2) It is clear from the testimony that defendant in engaging the services of plaintiff to make the sale of his property did not invest plaintiff as broker with the least discretion in fixing defendant's price and plaintiff's judgment as to the value of the property was in no wise considered or bargained for by defendant, nor was it contemplated that there should in any sense be an exercise of any discretion or judgment on the part of plaintiff in any of the negotiations towards fixing the price. The only thing defendant bargained for with plaintiff was to bring him a person who was willing to buy the property and pay defendant $85,000, plus plaintiff's commission of $5,000 therefor. This plaintiff did and he was therefore entitled to his commission. There was no possibility for the duty of plaintiff and his interest to clash. In such cases the broker is treated simply as a middleman and he earns his commission by bringing the parties together, and there is no rule or public policy which would prevent his recovery of commissions if he has a contract with each party. Authorities supra.

*E. A. Spencer* for respondent.

The agreement between the agents for defendant and the purchaser, made without the consent of the principals, to pool and divide their commissions, prevents a recovery by plaintiff. Norman v. Roseman, 59 Mo. App. 682; Levy v. Spencer, 18 Colo. 532, 33 Pac. 415, 36 Am. St. Rep. 303; Shepard v. Hill (Wash.), 34 Pac. 159. This would be true unless both principals consented thereto. Chapman v. Currie, 51 Mo. App. 40; De Steiger v. Hollington, 17 Mo. App. 388; McClure v. Ullman, 102 Mo. App. 697; Rosenthal v. Drake, 89 Mo. App. 358; Connor v. Black, 119 Mo. 134; Grumley v. Webb, 44 Mo. 451.

FOX, P. J.—This cause reaches this court by appeal on the part of the plaintiff from a judgment of the Jasper County Circuit Court in favor of the defendant. This action results from a transaction between the plaintiff and the defendant concerning the sale of a certain mining lease placed in the hands of plaintiff for sale by the defendant and an agreement and contract entered into by which the sum of $5,000 was to be paid plaintiff as commission for the consummation of such sale. This is the second appeal of this cause to this court. The first appeal was upon the part of the defendant and the cause was reversed and remanded. This appeal, as before stated, is on the part of the plaintiff.

The nature and character of this proceeding is fully set forth in the case of Corder v. O'Neill, 176 Mo. 401; it is therefore not essential to reproduce in detail the entire pleadings, but it will be sufficient to a full understanding of the issues presented in the last trial of this cause to briefly refer to some of the allegations in the petition and answer. The petition alleged that the plaintiff "was at all times hereinafter mentioned engaged in the business of selling real estate, mines,

mining property and leases on mining property in Jasper county, Missouri, as agent for such persons or concerns as might employ him therefor, and on March 22, 1899, the defendant, James O'Neill, was the owner of a certain lease known and described as the 'Get There Lease' in or near the city of Carterville in said county and State and on said day he was desirous of selling the same. That at the same time the plaintiff had as customer for a piece of mining property one C. C. Playter, who desired for himself and others and especially for one R. Tibbets, of Boston, Massachusetts, to purchase a mining lease in Jasper county, Missouri, and on said date the defendant entered into a contract with the plaintiff, whereby he agreed that if said Playter or his assigns should take the lease of the defendant, known as the Get There Lease, and should comply with the conditions of a contract made with the said Playter, or his assigns, for said lease and should pay to the defendant the sum of ninety thousand dollars in cash for said lease, on or before the first day of May, 1899, then the defendant will pay the plaintiff the sum of five thousand dollars in full for all commissions and compensation for services rendered by the plaintiff in and about the sale of the said Get There Lease. . . . That during the existence of said contract the said Tibbets, through his said agent, requested of the defendant that he would extend the time for the payment of the balance of the purchase money for said lease until the first day of June, 1899. Said contracts are herewith filed, marked 'Exhibits A and B.'

"Plantiff further states that at the time of procuring said property for sale defendant only asked the sum of eighty-five thousand dollars therefor and by agreement with defendant offered and contracted said property for the sum of ninety thousand dollars, it being agreed that the excess over eighty-five thousand

dollars, to-wit, five thousand dollars, should be paid by defendant to plaintiff for making said sale.

"That within the time limited plaintiff sold said property for ninety thousand dollars to one Frederick R. Tibbets on March 22, 1899, and five thousand dollars of the purchase price was thereupon paid by said Tibbets to plaintiff, and the balance was to be paid by said Tibbets on or before May 1, 1899."

The foregoing averments were followed by allegations asserting that there was a verbal agreement entered into between Tibbets, the purchaser procured by the plaintiff, and the defendant, to extend the contract for thirty days, giving said Tibbets that much more time to purchase said property. Then follows the averment alleging a breach of such oral agreement and the prayer for relief that by reason of the breach of such verbal agreement and promise to extend said original contract by the defendant and by reason of the fraud thereby practiced upon the plaintiff, plaintiff is damaged in the sum of five thousand dollars, for which sum he prays judgment.

After this cause was remanded to the circuit court of Jasper county for a new trial the defendant filed an amended answer on January 4, 1904. The first paragraph of said amended answer was a general denial. The new matter set up in the amended answer was as follows:

"SECOND. Further answering defendant states that without his knowledge or consent the plaintiff agreed to and did receive money as commission or compensation for services in and about the alleged sale, from the purchaser of the property described in the petition, and thereby forfeited all his claim against defendant and is not entitled to recover herein.

"THIRD. Further answering defendant states that without the knowledge or consent of defendant the plaintiff entered into an agreement with the represen-

tatives of the purchasers of the property described in the petition to 'pool' or divide the commissions received and to be received from the defendant and the purchaser of said property in the petition described. That said agreement was made before the consummation of the sale of said property. That in pursuance of said agreement the agent of the said purchaser did receive money from the latter as commission or recompense for services in and about said purchase and did carry out said agreement and pay a portion thereof to defendant. By reason whereof, plaintiff forfeited all his claims against defendant and is not entitled to recover herein."

To this amended answer the plaintiff filed a reply, which embraced a general denial of the new matter, and "further replying, plaintiff avers that plaintiff procured and introduced the purchaser to defendant and that plaintiff had no hand in the negotiations between them; that said purchaser and defendant made their own bargain without plaintiff having anything to do with fixing of the price or terms of said sale and without plaintiff's interference in anywise. Wherefore, plaintiff prays judgment as in his petition prayed."

Upon the issues thus presented the trial of this cause proceeded. It is practically conceded that the facts developed at the trial of this cause are substantially the same as in the trial of the cause upon the former appeal, except as to the evidence introduced upon the issue presented by the new matter in the amended answer of defendant; hence we deem it unnecessary to undertake to again repeat the facts developed which fully appear in the case of Corder v. O'Neill, supra, and shall confine our reference to the testimony to the issue presented by the new matter in the amended answer of the defendant. The testimony as disclosed by the record upon this issue is quite voluminous, but doubtless the trial court sustained a demurrer to the evi-

dence upon certain statements testified to by the plaintiff and witness Mr. Geddes, who was also interested in the transaction; therefore, we deem it sufficient to refer briefly to the testimony of the plaintiff and Mr. Geddes upon the issue presented in the answer of the defendant and upon which the court's action in sustaining the demurrer to the evidence was predicated.

The plaintiff was introduced as a witness and upon the subject of his employment by the defendant to make this sale, said:

"Q. Who named the price at which this property would be sold—who fixed the price? A. Mr. Bruen.

"Q. What was said in that connection, Mr. Corder, about the price of the property and the commission? A. We asked Mr. Bruen what his price was, and he said the price was $85,000. Then I said, 'Mr. Bruen, will you allow my commission out of that?' and he said, 'You will have to add it to it,' and I said to him, 'If I add my $5,000 to it, will you then hold the price at $90,000 and give me a contract back for the $5,000?' And he said, 'Yes.' That was the agreement between us."

As applicable to this same subject of employment and the nature of the employment, witness Mr. Geddes testified as follows:

"Q. You may state if you went there by arrangement between you and Mr. Corder at the time? A. Yes, sir.

"Q. Now go ahead? A. Col. O'Neill said it was for sale; but was in such shape he couldn't give an option. . . . I told him the parties were cash purchasers and didn't care for an option if he could sell it, and he said he could. Said his price was $85,000. . . . I told him I would add my commission to that amount.

"Q. Did you state what it was? A. No, I didn't at that time tell Col. O'Neill. I think I didn't. I am not sure.

"Q. State further all that was said? A. Well, he said he would want an immediate payment for the property and would give time on the balance."

The plaintiff again in testifying as to the information that he acquired from the defendant in relation to the property, said:

"Q. Now, what, if any, statistics did you get up in regard to the property and send to any of the parties you were putting this property to? A. I furnished a regular statement of it, together with a prospectus of it written up and describing the property.

"Q. Well, probably the jury would not understand what a regular statement was? A. Statement of the production and earnings, etc., and royalties, what the royalties amounted to.

"Q. Covering what period of time? A. I don't remember now, but very probably—I don't know whether they ran back as far as six months or what time.

"Q. From whom did you obtain the data you used in making up this statement? A. Mr. Bruen.

"Q. Where were you when you obtained them? A. I am trying to think where that was gotten—whether got it from Mr. Bruen—whether Mr. Geddes got it or I. We were trying to deal together, you know, and I don't know whether Geddes went for a fact or I.

"Q. To whom did you send those statements or prospectus? A. I furnished it first to Mr. House, who was getting the statement originally for the Playters.

"Q. And the statement went to the Playters? A. Yes, sir. . . . I presented these facts first to Mr. House.

"Q. Going to Playters—for the Playters? It was the medium you adopted to get it to the Playters? A. Yes, that is right."

Plaintiff also testified as to the meeting between

the defendant and the purchaser, Mr. Playter, who was with plaintiff and Mr. Geddes, as follows:

"Q. And you were present the time that [the contract of sale] was agreed to between Playter and Bruen? A. Yes, sir.

"Q. And took part in that discussion? A. Yes, sir.

"Q. And you wanted the thing to go through and assisted in whatever you could to get them together? A. Yes, sir.

"Q. Who fixed the terms—who agreed upon the terms? A. I arranged the terms with Mr. Bruen.

"Q. I mean between Playter and Bruen? A. We were all together, all three of us, discussing the matter together, you know."

Upon this same subject witness Geddes testified and made answer to the following questions:

"Q. What I mean, you gentlemen came in there and talked back and forth? A. Yes.

"Q. And to some extent more or less discussion between you, and the result of all the discussion there was these contracts, the terms of these contracts were agreed upon and afterwards reduced to writing? A. Yes, sir.

"Q. That is a fact, isn't it? A. Yes, sir."

Upon the subject of dividing the commissions to be paid by the purchaser and the seller, who was the defendant, the plaintiff as the record discloses testified as follows:

"Q. You and Mr. Geddes in all this matter were in together? A. Yes, sir.

"Q. Now, I will ask you if it isn't a fact that Mr. Geddes and you had a contract at that time by which you were to receive a commission from the purchaser of this property for the making of the sale? A. When we first entered into the agreement Mr. House, who

at that time was hunting for a property for Playter, said to me that I will make something out of this and I will divide it with you, which he afterwards done.

"Q. He gave you a part of the commission he had received from the purchaser? A. Yes, sir.

"Q. And that was the arrangement during all this time, commencing prior to the contract of March 22nd? A. Yes.

"Q. You never told Col. O'Neill that? A. I did not. . . .

"Q. As a matter of fact, you were interested on both sides in the way of commissions all through this matter? That is a fact? A. Yes, I said that."

Witness Geddes, upon the subject of the division of commissions, testified as follows:

"Q. You and Mr. Corder were working together? A. Yes, sir.

"Q. Under an agreement to divide what you made? A. Yes, sir.

"Q. And you did divide what you received from the purchaser? A. Yes, sir. It was divided between four of us. Well, we never received any. It was to be divided.

"Q. You did get some? From the purchaser, now? Not Col. O'Neill's side, but the other? A. Yes, we received a payment from Mr. Playter.

"Q. And there had been an understanding to that effect that you were to receive that all the time? Col. Corder had an agreement with them for $3,000? A. That is my recollection.

"Q. Out of the commission? A. Yes, as commission.

"Q. And that agreement was in existence during all the time of these transactions? A. I presume so.

"Q. You knew of it before this contract was signed, didn't you? A. Yes, sir.

"Q. You never advised Col. O'Neill of that fact?
A. No, sir."

While the record discloses numerous other answers
to questions propounded to plaintiff upon his examina-
tion which might be construed as being in conflict with
the answers to questions as heretofore recited, yet we
do not deem it necessary to reproduce all the questions
and answers propounded to the plaintiff. We will give
such other answers as are disclosed by the record and
referred to by learned counsel for the plaintiff such
attention as they merit during the course of the opin-
ion.

At the close of the evidence the court sustained a
demurrer to the evidence and instructed the jury that
under the law and the evidence in the cause their ver-
dict should be for the defendant. To the action of the
court in so declaring the law plaintiff properly preserv-
ed his exceptions. Upon the giving of such instruc-
tion the plaintiff took an involuntary nonsuit with leave
to move to set the same aside. Plaintiff then filed his
timely motion to set aside the nonsuit and grant the
plaintiff a new trial, which was by the court overruled
and judgment was rendered in conformity to the ver-
dict which the jury was directed to return, and from
this judgment the plaintiff prosecutes this appeal, and
the record is now before us for consideration.

OPINION.

The record before us in this cause presents but one
legal proposition, that is, under the facts developed
upon the trial of the issue presented by the new mat-
ter in the amended answer of the defendant, is the
plaintiff entitled to recover? In other words, was the
action of the court in sustaining a demurrer to the evi-
dence offered by plaintiff proper or was it erroneous?

We have carefully analyzed the facts developed at
the trial, as disclosed by the record, and in our opin-

ion the agreement or arrangement with Mr. House, who was representing the purchaser in this transaction, by which the commissions paid by the purchaser and the commissions to be paid by the defendant were to be divided between the agents representing both the buyer and the seller, clearly falls within that class of contracts which have been repeatedly condemned by the appellate courts of this State and in numerous other jurisdictions upon the ground that such contracts and arrangements between agents and brokers are contrary to public policy and therefore absolutely void. The appellate courts of this State have spoken in no uncertain or doubtful terms concerning transactions similar to the one in the case at bar. In Norman v. Roseman, 59 Mo. App. 682, the facts developed in that case upon which the court predicated its announcement of the rule of law which would govern it were about as follows: The defendant owned some lots on Cleveland avenue, which he valued at $20,000. A syndicate, of which Sawyer was a member, owned a business lot on Franklin avenue, which they valued at $50,000. Sawyer, who was also a real estate agent, had the Franklin avenue property for sale or exchange. The plaintiff occupied a desk in Sawyer's office. Previous to the negotiations for the trade in controversy, he had endeavored to exchange with the defendant other property which Sawyer had on his list for the Cleveland avenue property. Finally the defendant employed him to trade with Sawyer on the following basis, to-wit: The Franklin avenue property to be put in at $49,500; the defendant to convey to Sawyer the Cleveland avenue property at a valuation of $20,000; the defendant to assume a mortgage debt of $20,000 on the Franklin avenue lot, and execute a second mortgage to Sawyer for $9,500. The defendant agreed to pay plaintiff $200 if he succeeded in making the trade. Sawyer agreed to make the exchange, and the defendant backed out of the trade. Plaintiff

admitted on his cross-examination that, if the trade had been consummated, he and Sawyer would have "pooled" and divided their respective commissions; that this was their universal way of doing business in such cases. The plaintiff also admitted that he had not communicated this arrangement between himself and Sawyer to the defendant. Upon this state of facts it was announced as the settled rule that a real estate agent cannot legally charge or receive commissions from both parties to a sale or trade unless they consent to it, and that the "pooling arrangement" embraced in the recitation of facts as heretofore indicated, which was testified to by the plaintiff in that cause, while it may not be construed as strictly speaking a double agency, was tantamount to it and possessed all of its ugly features. Touching such "pooling arrangement" the court said that under it the plaintiff and Sawyer were attempting to do indirectly what the law would not permit them to do directly, that is, charge commissions on both sides and thereby depriving the defendant of the disinterested judgment and effort of the plaintiff in effecting to the best advantage to himself an exchange of his property with Sawyer, to which under the contract of employment he was justly entitled.

In Chapman v. Currie, 51 Mo. App. 1. c. 43, it was announced as a general rule that "a man cannot act as the agent or representative of both parties to a trade, and, if he puts himself in so unworthy a position, the law will not recognize any of his pretended rights growing out of it. Such contracts are held to be absolutely void as being contrary to public policy, and it makes no difference that such common agent was guilty of no actual wrong. The courts refuse to countenance such an employment, not for the sake of the principals, but for the sake of the law," and it was announced by the court that the great weight of authority is with this

view. This case was cited approvingly by this court in Connor v. Black, 119 Mo. 1. c. 134.

In Lynch v. Fallon, 11 R. I. 311, it was held that "a broker acting at once for both vendor and vendee assumes a double agency disapproved by the law, and which, if exercised without full knowledge and free consent of both parties, is not to be tolerated." It was said by the court in that case: "As agent for the vendor, his duty is to sell at the highest price; as agent for the vendee, his duty is to buy for the lowest; and, even if the parties bargain for themselves, they are entitled to the benefit of the skill, knowledge and advice of the agent, and, at the same time, to communicate with him without the slightest fear of betrayal, so that it is hardly possible for him to be true to the one without being false to the other."

In Everhart v. Searle, 71 Pa. St. 256, it appeared that the agent was acting for the purchaser as well as the seller. It was there held that such an arrangement, unless made with the consent of both parties, was void as against public policy, and it was said by the court that "the danger of temptation from the facility and advantage of doing wrong, which a particular situation affords, does, out of mere necessity, work a disqualification."

In Rice v. Wood, 113 Mass. 133, the law as applicable to this subject was very clearly stated. It was there said that "contracts which are opposed to open, upright and fair dealing are opposed to public policy. A contract by which one is placed under a direct inducement to violate the confidence reposed in him by another, is of this character. . . . Nor is it necessary to show that injury to third persons has actually resulted from such a contract, for in many cases when it had occurred this would be impossible to be proved. The contract is avoided on account of its necessarily injurious tendency."

The reason of the rule of law applicable to the subject now under discussion is nowhere better stated than in DeSteiger v. Hollington, 17 Mo. App. 1. c. 388. The reason for such rule was given in this language by the court in that case: "Agency or employment for two parties in antagonistic interests, is not a worthy position to occupy. It is not possible for a man to serve two masters, with opposing interests, honestly, at the same time; the rights of one, or the other, or both, will necessarily suffer. The temptation for wrong is too great for ordinary human nature. So jealous is the law as to the relation between principal and agent, that in passing on questions of this character, arising between them, the mere fact of the discovery of no actual fraud or bad faith, does not relieve the case in the least. 'The cases are nearly, if not quite uniform, where the double employment exists and is not known. No recovery can be had against the party kept in ignorance and the result is not made to turn on the presence or absence of designed duplicity and fraud, but in consequence of established policy.' "

The doctrine announced by the Courts of Appeals of this State is fully recognized by this court in Connor v. Black, 119 Mo. 126; Grumley v. Webb, 44 Mo. 444; and Atlee v. Fink, 75 Mo. 100. In the case last cited, Judge Henry, in speaking for this court, said: "One employed by another to transact business for him has no right to enter into a contract with a third person, which would place it in his power to wrong his principal in the transaction of the business of the latter, and which would tempt a bad man to act in bad faith towards his employer. The interests of the defendant's employers, and those of plaintiffs, as buyers and sellers, were antagonistic, and defendant could not serve two masters in a matter in which there was such a conflict in their interests."

In the case at bar it is clear from the testimony of

plaintiff and witness Geddes that the plaintiff in this cause was to share in the commissions to be paid by both the purchaser and the seller. In treating of a transaction of a similar character, the Supreme Court of Colorado, in Levy v. Spencer, 18 Colo. 532, thus emphatically condemned it. It was there said: "In our judgment, this agreement comes clearly within that class of contracts that is inhibited by public policy, and consequently void. By its terms each agent was to share in the commissions paid by both principals. The compensation to be jointly shared was contingent upon the consummation of the trade or sale, and this would have a tendency to induce them to disregard, if not to sacrifice, the interests of their principals, if necessary to effect that result. The fact that a sale price was fixed by the principals upon their respective properties does not answer this objection. Each was entitled to the benefit of the unbiased judgment of his agent as to the value to be placed upon the other's property, and to a reasonable effort on the part of such agent to obtain a reduction of the value to be allowed therefor in the exchange. Their pecuniary interest might have prevented such disinterested action on the part of these agents; and, it appearing from the allegations of the complaint that they 'did effect the trade or sale of the property as between their respective principals,' the transaction is as objectionable as those universally condemned, wherein one agent acts for both principals without their knowledge or consent. This objection is not answered by the claim that the evidence as introduced shows a transaction different from that pleaded, that their principals negotiated the trade between themselves, and that in fact plaintiff and defendant acted only as middlemen in bringing Nix and Jones together."

Learned counsel for appellant earnestly and very ably present the contention that the court erred in

sustaining the demurrer to the evidence offered on the part of the defendant and in directing a verdict for the defendant. This insistence by counsel for appellant is predicated upon that line of cases which hold that, if the agent or broker is not employed to negotiate the sale or purchase, but simply to bring two parties together and permit them to make their own bargain, in such cases the agent or broker is a mere middleman and may recover an agreed compensation from either or both, though neither may know that compensation from the other is expected. That there is a class of cases maintaining such rule there is no dispute. They are fully cited in the brief of learned counsel for appellant; however, we do not feel called upon to express an opinion as to the soundness of the doctrine announced in those cases, for the reason that the facts developed upon the trial of the issue presented in the new matter embraced in the amended answer of defendant in this case, by no means places the plaintiff in a position to invoke the doctrine announced in those cases. An analysis of plaintiff's petition, which is the foundation of this action, together with his admissions as a witness, and the testimony of his co-worker, Mr. Geddes, clearly demonstrate that the plaintiff was not a mere middleman, but was acting as the agent of the defendant in the sale of this property. We find in the petition an averment that "plaintiff further states that at the time of procuring said property for sale defendant only asked the sum of eighty-five thousand dollars therefor and by agreement with defendant offered and contracted said property for the sum of ninety thousand dollars, it being agreed that the excess over eighty-five thousand dollars, to-wit, five thousand dollars, should be paid by defendant to plaintiff for making said sale." Plaintiff in his petition makes the further allegation "that within the time limited plaintiff sold said property for ninety thousand dollars to one

Frederick R. Tibbets on March 22, 1899, and five thousand dollars of the purchase price was thereupon paid by said Tibbets to defendant, and the balance was to be paid by said Tibbets on or before May 1, 1899.''

In our opinion it is manifest from the disclosures of the record that while the plaintiff may not have committed any wrong or perpetrated any fraud upon either the seller or the buyer of the property involved in this transaction, yet it is apparent that he was acting for two parties occupying antagonistic positions. He was to receive commissions from the defendant, the seller, and also commissions from the purchaser. In other words, he was acting for both parties. The defendant, the owner of the property, it is true, had fixed a definite price for the property. The price being fixed, it was a matter of interest to find a purchaser. Plaintiff, referring to information concerning this property, in his testimony says that he procured statistics in reference to production, earnings and royalties and what the royalties amounted to from Mr. Bruen, who was managing the property for the defendant. This information, doubtless, and as the plaintiff states, was procured for the purpose of inducing the party they had in hand to purchase. Now, it is clear that he was to receive commissions for making the purchase of this property from the purchaser; therefore, we are unable to see how it can be seriously contended, even upon the question of presenting this information to the purchaser, with the purpose of inducing him to purchase, that the plaintiff occupied a disinterested position and unsurrounded by any incentive to act unfairly with the defendant or the purchaser, from both of whom he was to receive commissions. We do not mean to say that he in any way colored the information he received in respect to the output, earnings and royalties of the property to sell to the purchaser, but we do say that he was deeply interested in the consummation of that sale,

and the incentive to unduly color the information he had received, when presenting it to the purchaser, was present; therefore, it follows that he was acting as well for the purchaser as he was for the seller, and in presenting this property to the purchaser, who was one of his principals, there was at least present the incentive for him not to act in that fair and disinterested manner which his duty would require him, under the circumstances, to do. While it may be said that a misrepresentation as to the value of the property and its output and earnings would not prejudice the interests and rights of the defendant, the seller, yet it must not be overlooked that this plaintiff was acting for both parties, and that if he in any way misrepresented the property to the purchaser, with a view of inducing him to purchase, he was committing a wrong against him from whom he was receiving a commission to make such purchase. But aside from this, the plaintiff admitted upon the witness stand that he was present at the time the contract of sale was agreed to between Playter and Bruen, and also that he took part in the discussion at that meeting. When the inquiry was made of the plaintiff as to who fixed the terms or who agreed upon the terms, he answered, "I arranged the terms with Mr. Bruen." The further inquiry was propounded, "I mean between Playter and Bruen?" and the plaintiff answered that "we were all together, all three of us, discussing the matter together, you know." It is true that the plaintiff in testifying in relation to this transaction made some answers which seemingly are in conflict with those recited in the statement of this cause. Such questions and answers are embraced and referred to in the brief of counsel for appellant. It is sufficient to say upon that question that even though the answers referred to in the brief of counsel were to be construed as in conflict with the other answers made by the plaintiff, yet we take it that the court, if the plaintiff in re-

sponding to questions made answers which were against his interest, would be justified in acting upon the statement contained in those answers, for the reason that they were presumptively true.

We see no reason to further discuss the propositions disclosed by the record. We are of the opinion that the plaintiff does not fall within that class of cases which would designate him as a middleman. The appellate courts of this State, as indicated in the citations heretofore made, evidently do not look upon with favor any doctrine which would encourage agents and brokers in accepting commissions in deals from both parties occupying antagonistic positions in such deal. Agents engaged in the sale of real estate should have but one principal, who is entitled to the best judgment, disinterested advice and assistance and service of such agents respecting the deals which they may have in hand, and we are unwilling, where the proof shows that commissions and arrangements have been entered into by which the agent or broker is to receive commissions from both sides, to indulge in any refined theories to make him a middleman, when seeking to recover the amount of the commission agreed upon between one of such principals.

We have given expression to our views upon the leading legal propositions disclosed by this record, which results in the conclusion that the action of the trial court in sustaining the demurrer to the evidence was proper, and its judgment should be affirmed. It is so ordered.

All concur.