William H. ARMSTRONG, Jr., Appellant/Appellee,

v.

REPUBLIC REALTY MORTGAGE CORPORATION, Appellee/Appellant.

Nos. 78–1501, 78–1536.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1980.

Decided Sept. 18, 1980.

John J. Cole, Theodore H. Hellmuth, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellant/appellee and cross–appellant.

W. David Wells, James W. Erwin, Thompson & Mitchell, St. Louis, Mo., for appellee/appellant and cross–appellee Republic Realty Mortgage Corp.

Before ROSS and HENLEY, Circuit Judges, and PORTER, District Judge.*

* The Honorable DONALD J. PORTER, United States District Judge for the District of South Dakota, sitting by designation.

**1346**

DONALD J. PORTER, District Judge.

SUMMARY

On appeal in this diversity case tried by jury (78–1501), Republic urges that, as a matter of law, (1) it was not plaintiff's agent; (2) if it was, it did not breach any duty owed plaintiff; (3) if it did, plaintiff was not thereby damaged; (4) punitive damages should not have been allowed; and (5) the punitive damages awarded ($125,000), are, in any event, excessive.

Armstrong cross–appeals, (78–1536), contending that the evidence supports the jury verdict awarding Armstrong $75,000 compensatory damages against Republic, for breach of fiduciary duty as agent of Armstrong, and that the trial court therefore erred in reducing the award to $14,000 by judgment n. o. v.

We affirm the judgment of the trial court [1] awarding Armstrong $14,000 compensatory and $125,000 punitive damages against Republic.

FACTUAL BACKGROUND

In 1973, a Missouri general partnership, Fortune–Tampa Co., (Fortune) was organized to own and build on a 6.5 acre tract in Tampa, Florida, office and warehouse space for lease. Plaintiff was a partner during the 1973–75 period relevant to this suit.[2]

Defendant Republic Realty Mortgage Corporation (Republic) operates branch offices in St. Louis, Atlanta, Milwaukee, and Kansas City, and a home office in Chicago. Republic's principal business is to act as a mortgage broker in real estate mortgage transactions. It has since 1949 acted as a loan correspondent for defendant Continental Assurance Company, (CAC), and currently is correspondent for various other insurers. Where Republic submits a loan application to any such insurer, if the insurer commits to make the loan on conditions agreeable to the borrower, borrower pays a fee to Republic for placing the loan. If the loan is made, Republic receives a fee from the insurer for collecting and remitting payments by the borrower and for other services.

To start the Florida project, Fortune borrowed $425,000 in connection with the land purchase, and took out a construction loan of $1,500,000. Seeking long–term financing for the project, Armstrong and his main partner, Bakewell, then contacted Terry Dunaway, a senior vice president of Republic, and officer in charge of its St. Louis office. After consulting with Armstrong and Bakewell, and then with CAC, Dunaway drafted a first mortgage loan application by Fortune to CAC, which Fortune executed March 2, 1973. The same date, Fortune paid Republic a fee of $14,000, the fee to be returned if the loan application were not approved by CAC. On April 26, CAC issued a written loan commitment which Fortune accepted in writing on May 4, 1973.

The loan commitment from CAC called for a floor loan of $900,000 to be closed by August 1, 1974, a second level loan of $225,000 to be closed when tenant leases reached a certain annual dollar total, and a third level loan of $360,000 if tenant leases reached a specified additional annual dollar total. February 1, 1975, was the deadline for closing the second and third level loans, and the second and third level loan commitment expired then if borrower had not met the leasing requirements. The loan commitment called for a first mortgage loan at 8⅝ percent interest, repayable in monthly installments with final payment due in twenty years. Prepayment for ten years was prohibited and, beginning the eleventh year, was allowed only with a five percent penalty, with the penalty reducing one–half of one percent each year thereafter.

Construction on the 6.5 acre site in Tampa began the summer of 1973, but material shortages and labor problems delayed the project six months so that rental space was not available for occupancy until April, 1974. Because of the delay, Fortune real-

1. The Honorable JOHN F. NANGLE, United States District Judge for the Eastern District of Missouri.

2. Armstrong became sole owner of the Fortune–Tampa project May 23, 1975. This action was commenced in December, 1975.

ized it would probably need more time to secure sufficient tenant leases to qualify for second and third level funding. Thus, it needed an extension of the February 1, 1975, second and third level loan closing date.

From the beginning, Republic discouraged direct contact by Fortune with CAC. Thus, the frequent letters and reports from Fortune regarding its efforts to qualify for second and third level funding under the CAC loan commitment were sent to Dunaway of Republic, rather than to CAC. In June, 1974, Fortune requested Dunaway to seek from CAC at least a three month extension of the second and third level loan closing date. Dunaway secured a three month extension and in July, 1974, wrote Fortune the good news, stating in his letter that, "We made an extensive effort in your behalf to obtain this extension   .   .   ."

The floor loan of $900,000, was closed November 4, 1974, and the note and first mortgage on the 6.5 acre Tampa tract were delivered to CAC. During the time until the second and third level loans were to close, (May 1, 1975) Fortune continued to seek tenant leases (CAC required a minimum three year lease term) for the rental space remaining at the Tampa site, so that the annual rental would meet the leasing requirement in the loan commitment for full funding of the $1,485,000 loan.

Fortune forwarded to Dunaway of Republic each lease as obtained. Pursuant to a CAC request, the leases were held at Republic's Chicago office until required by CAC in connection with the second and third level loan. Fortune, up to May 1, 1975, remained in close contact with Dunaway (rather than with CAC) by correspondence, by telephone, and by personal conferences, concerning Fortune's continuing leasing efforts to qualify for full funding of $1,485,000 by the May 1, 1975, loan closing deadline.

On April 28, 1975, CAC advised Dunaway that it would fund only the second level ($225,000) of Fortune's loan. Dunaway immediately advised Fortune by telephone. Fortune concluded CAC's refusal to fully fund required it (Fortune) to seek the per-

mission of CAC to prepay the floor loan. In no other way could the CAC first mortgage be released so that Fortune could seek other first mortgage long–term financing. Fortune needed the full third level funding from CAC to pay off short–term loan commitments connected with the project and could not feasibly use expensive second mortgage money on a long–term basis to go with the total CAC first mortgage funding of $900,000 floor loan plus the second level of $225,000.

Fortune turned to Dunaway later on April 28 asking him to contact CAC to request that either the loan be fully funded or, if CAC refused, that CAC permit prepayment of the existing mortgage without penalty. Dunaway telephoned CAC, who advised him they would permit prepayment for a one percent penalty fee ($9,000). In the same long distance call between Dunaway in St. Louis and CAC in Chicago, Dunaway reminded CAC that the mortgage was already closed against prepayment for ten years, and that Fortune had agreed to that, and had agreed to pay a five percent prepayment penalty in the eleventh year. Dunaway then suggested that CAC charge a prepayment penalty of four percent ($36,-000) because that would be less than Fortune had agreed upon in the mortgage. The CAC executive then said, "All right, you negotiate whatever you can on behalf of us, and whatever you get over the one percent that I want for my company, we'll split."

Dunaway then reported back to Fortune by telephone that CAC would permit a prepayment for a penalty of four percent ($36,-000). Thereafter, on April 28 or 29, a Fortune executive and Fortune's attorney telephoned CAC in Chicago to once again request full funding and, failing that, prepayment without penalty. CAC refused to fund beyond the second level, but agreed to allow prepayment if paid a four percent penalty ($36,000). Fortune offered $10,000, and CAC responded with $18,000, which Fortune accepted, concluding the telephone conference.

On May 1, 1975, using a short term loan, Fortune prepaid to CAC the $900,000 floor

loan plus accrued interest and a prepayment penalty of $18,000. One–half of the penalty was paid to Republic by CAC. Neither Dunaway nor any other agent of Republic ever advised Fortune that Republic was sharing in the prepayment penalty Fortune paid to CAC. Plaintiff did not know of the payment to Republic. Of the $9,000 Republic received, Republic paid $2,000 to Dunaway.

On September 5, 1975, the National Life and Accident Insurance Co. made a first mortgage loan commitment to plaintiff to loan Fortune $1,715,000 with interest at ten percent for twenty–five years, amortized over the life of the loan.

After a jury trial, the jury returned a verdict that CAC had violated its loan commitment by refusing to fund the third level loan on May 1, 1975; the jury also found that Republic had violated its fiduciary duty as an agent of Fortune. The jury awarded compensatory damages of $251,815 against CAC, and $75,000 against Republic. The jury also awarded punitive damages of $125,000 against Republic.

After judgment, the trial court granted a partial judgment n. o. v. in favor of Republic, reducing the compensatory damages awarded against Republic from $75,000 to $14,000. The trial court refused to alter the punitive damage award.[3]

While on appeal to this court, CAC settled its judgment by paying Fortune $175,-000, whereupon the Fortune judgment against CAC was remanded to the trial court, and vacated.

## I.

### Republic As Fortune's Agent

Plaintiff contends that Republic was Fortune's Agent from March 2, 1973, (when Fortune executed the loan application prepared by Republic) until May 1, 1975, (when the second and third level loan should have been closed). Republic argues instead that

any agency obligation it had to Fortune ended when Fortune accepted the CAC loan commitment on May 4, 1973, since the loan application which Republic prepared and which Fortune signed provided that Fortune's $14,000 fee to Republic was due and payable upon Fortune's acceptance of the loan commitment. For reasons which follow, we find it unnecessary to decide whether Republic's agency was continuous over the period contended by plaintiff. We assume, without deciding, that any agency created by the terms of the loan application by Fortune to Republic terminated on May 4, 1973, when Fortune accepted the CAC loan commitment which Republic obtained.

The decisive agency issue before this Court is whether the conduct of the parties after May 4, 1973, established that Republic was acting as Fortune's agent between April 28 and May 1, 1975, in connection with the prepayment negotiations with CAC, and if so, whether Republic breached its duty to Fortune. We rule the issue in plaintiff's favor.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1957); *Northern v. McGraw–Edison Co.*, 542 F.2d 1336 (8th Cir. 1976) *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); *Leidy v. Taliaferro*, 260 S.W.2d 504 (Mo. 1953). "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Restatement (Second) of Agency § 1, Comment b (1957). Dunaway's testimony is alone enough to provide the factual elements[4] sufficient to support a legal conclusion that Republic was an

---

3. See opinion of the trial court concerning the post–judgment motions, 452 F.Supp. 425 (1978).

4. Letter from Dunaway to Hayes [of Fortune] (April 30, 1975). "At your request I also re-

quested Continental consider allowing the borrower to pay off the loan in full at this time. They have agreed to allow a prepayment in full at this time for a four percent fee on the out-

agent—a special agent[5]—of Fortune concerning the loan prepayment negotiations with CAC April 28 to May 1, 1975.

The agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.[6] Among the agent's fiduciary duties to the principal is the duty . . . not to compete with the principal on his own account . . . in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them.[7]

"[D]uring the existence of the relation, a gratuitous agent . . . is subject to all the paid agent's duties of loyalty."[8] "In short, the paramount and vital principle of all agencies is good faith, for, without it the relation of principal and agent could not well exist. So sedulously is this principle guarded that all departures from it are esteemed frauds upon the confidence bestowed." *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo.App.1968).

Undisputed evidence shows that Republic after becoming Fortune's special agent (1) secretly urged CAC to raise to $36,000 the $9,000 prepayment penalty fee CAC originally decided to charge Fortune; (2) secretly solicited and obtained an agreement from CAC to divide with it any prepayment fee over $9,000 paid by Fortune; and (3) reported back to its principal, Fortune, that CAC wanted $36,000 to allow prepayment, and urged upon Fortune the propriety of the four percent ($36,000) penalty.

In its brief, Republic writes that Fortune's prepayment of the existing "floor" loan mortgage would cause Republic to lose the loan servicing fee it would otherwise receive from CAC over the period of the loan. Republic goes on to concede that its "interest was thus potentially adverse to Fortune–Tampa's, should [Fortune] attempt to prepay the loan."[9]

Once Fortune requested Republic on April 28, 1975, to negotiate with CAC for prepayment, Republic's "potential" adverse interest immediately became an actual adverse interest. Republic nonetheless agreed to do as Fortune requested, remaining silent about its own adverse interest in the subject of the agency. We note also that there is nothing to show that Fortune knew or should have known that Republic intended to claim a fee out of any prepayment penalty collected by CAC.[10] Republic, when

---

standing principal balance. This would amount to approximately $36,000. . . . . Will you please let me know which direction you wish to pursue. . . ." R 726–28, 797.

5. "A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service." Restatement (Second) of Agency § 3(2) (1957).

6. "The purposes which the principal has manifested to the agent as the object of the agency constitute the benefit which the principal is entitled to have the agent seek." Restatement (Second) of Agency § 387, Comment a (1957).

7. Restatement (Second) of Agency § 13, Comment a (1957).
   *See also id.* at §§ 387, 393.

8. Restatement (Second) of Agency § 16, Comment b (1957).

9. Under written contract between CAC and Republic as its "correspondent", in force since 1949, CAC "assumes no liability for payment of service fees," (§ VII), and CAC may terminate at any time as to any mortgage, Republic's correspondent services (§ X(c)). Thus CAC could, without incurring any liability to Republic, allow prepayment of any mortgage without penalty, or with penalty in any amount CAC chose where the mortgage terms did not allow prepayment at mortgagor's option.

10. Fortune's entrusting Republic to act as its agent with CAC regarding prepayment can be seen as reasonable, given the post–May, 1973, dealings between the parties. It bears emphasizing that after CAC gave its loan commitment, Republic discouraged direct contact by Fortune with CAC. Thus, over the next two years Fortune seldom communicated with CAC, but instead frequently in person, by telephone, and by letter, with Republic, usually Dunaway, concerning the project. At various times at Fortune's request, Republic contacted CAC to seek on behalf of Fortune some modification in the loan structure which would benefit Fortune, though not necessarily CAC. Republic, as where it obtained for Fortune an important three month extension of the second and third level loan closing date, made it plain it worked very hard for Fortune's interest; in that instance, Dunaway writing that "we made

it accepted the special agency, had a strong motive to want CAC either to refuse prepayment, or to permit it only if conditioned on a high prepayment penalty. Under the circumstances Republic should not have accepted the special agency at all but, having done so, its subsequent conduct must be measured against the fiduciary duty to Fortune implicit in the special agency Republic knowingly assumed.

Because of Republic's conflict of interest, and because of its secret competition with and disloyalty toward its principal, its claim of non–liability because of a mere "middle–man" status cannot stand, nor will the evidence permit its claim of a lawful dual agent status. *Corder v. O'Neill*, 207 Mo. 632, 106 S.W. 10, 14 (1907); *Cox v. Bryant*, 347 S.W.2d 861 (Mo.1961). There was sufficient evidence before the jury from which it could properly find that Republic was a special agent of Fortune from April 28 to May 1, 1975, and that Republic breached its fiduciary duties while acting as such agent. The trial court was correct in denying Republic's motion for directed verdict as to Count II of the complaint (which presented the issue of whether Republic breached an agency duty owed plaintiff).

II

*Republic's Compensatory Damage Liability to Plaintiff*

By judgment n. o. v. the trial court reduced to $14,000 the $75,000 sum the jury awarded Armstrong against Republic as actual damages. On his cross–appeal plaintiff Armstrong asks that we reinstate the $75,000 verdict. We decline to do so for reasons which follow.

In the spring of 1973, after Fortune applied in writing to Republic for a first mortgage loan, Republic obtained from CAC a written loan commitment to Fortune, which Fortune accepted. Fortune paid Republic

the $14,000 provided for in the loan application as a commission, due Republic upon Fortune's acceptance of the loan commitment. In November, 1974, Fortune executed and delivered to CAC, pursuant to the loan commitment, a note and first mortgage for $900,000 (the "floor" loan).

The loan commitment and the mortgage together set forth in writing the agreement between Fortune and CAC concerning the $360,000 third level loan which CAC had agreed in the loan commitment to make to Fortune. Through Republic, Fortune obtained a contract under which CAC was legally bound to Fortune to make the third level loan under the conditions of the agreement, conditions which Fortune agreed to.

The duties of Republic to Fortune, stated most favorably to Fortune, must still be those and only those which could be reasonably and fairly implied under all the circumstances. This is so because Fortune had no *written* agency contract with Republic except the loan application. Nothing therein obligated Republic to guarantee that CAC would perform its contractual duty to Fortune, nor was Republic required by the terms of the loan application to "advocate" to CAC (in Fortune's behalf) that CAC perform its contractual duty. Once Fortune and CAC had mutually agreed in writing, Republic at most owed Fortune (1) a duty to assist it, when requested, in meeting its contract obligations,[11] and (2) a duty not to prevent or hinder, by affirmative act, the execution of the contract. Nothing in the conduct of the parties (Fortune and Republic) after Fortune accepted the loan commitment would support a conclusion that Republic had expressly or impliedly agreed to any broader agency duty concerning CAC's obligation to make the third level loan.

CAC notified Republic on April 28, 1975, that CAC would not fund the third level

an extensive effort in your behalf to obtain this extension." All prior circumstances considered, it was not unreasonable, on April 28, 1975, for Fortune to make the request it did to Republic, through Dunaway, nor was it unreasonable for Fortune to believe and expect that Republic having accepted it, would carry out

the special agency in good faith. *Groh v. Shelton, supra.*

11. We do not hold that such a duty, to assist when requested, is unlimited. Our decision does not require that we fix the limits of such a duty, since the evidence shows that Republic did in fact assist when requested.

loan. Republic notified Fortune of the CAC decision the same day. There is no evidence that between the spring, 1973, loan application and April 28, 1975, Republic affirmatively acted to obstruct the contract for the third level loan. Nor did Republic fail to do anything Fortune requested, which failure would have supplied CAC grounds for lawfully refusing to execute the contract.[12]

Armstrong argues in his brief:

In our case, the fact that CAC may have first decided that it would not provide third–level funding, in breach of its contract, is irrelevant. Republic still owed a duty to Armstrong to attempt to change this decision. Thus, the critical decision in our case is the firmness of CAC's discretionary resolve not to fund the remainder.

■ We answer that CAC's duty to make the third level loan was not *discretionary*, but was instead contractual. Assuming, without deciding, that Republic was Fortune's agent during the time in question in this Part II, we hold that Republic had no duty to "advocate" nor to guarantee or assure that CAC would comply with its contract concerning the third level loan.[13] We do not resolve the issue on the basis of causation (what caused CAC to violate its contract), but instead simply on the basis that, as a matter of law, on this record, Republic breached no fiduciary duty owed Fortune concerning CAC's obligation to make the third level loan.

Republic concedes in its brief that plaintiff sustained $14,000 actual damages (the commission paid Republic for placing Fortune's loan with CAC) if Republic breached a fiduciary duty it owed Fortune. We have already held (in Part I) that there was such a duty which Republic breached and thus we conclude that Republic owes plaintiff actual damages of $14,000.

■ The standards for granting a judgment n. o. v. are the same as those governing directing a verdict. *Schneider v. Chrysler Motors Corp.*, 401 F.2d 549, 554 (8th Cir. 1968). The federal and Missouri standards are the same, *Savage v. Christian Hospital Northwest*, 543 F.2d 44, 46 (8th Cir. 1976). We have reviewed the record under the standards set out in *Schneider, supra*, 401 F.2d at 554, and conclude that the trial court was correct in reducing to $14,000 the compensatory damages awarded plaintiff Armstrong.

### III

#### *Punitive Damages*

The jury awarded Armstrong $125,000 punitive damages against Republic. Republic contends that it cannot be charged with the legal malice necessary under Missouri law for punitive damages. It also contends that the amount of the award is excessive as a matter of law.

■ Under Missouri law, punitive damages may be granted as a means of punishing and deterring wrongful conduct. Punitive damages must be supported by an award of compensatory damages, *Longmore v. Merwin*, 585 S.W.2d 545, 546 (Mo.App. 1979), but are not specifically limited in proportion to the amount of the compensatory award. *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479 (Mo.1972); *State v. Shain*, 341 Mo. 733, 108 S.W.2d 351 (1937); *Young v. Jack Borings, Inc.*, 540 S.W.2d 887, 897 (Mo.App.1976). The amount of punitive damages is also proportioned "to the degree of malice, criminality or contumely characterizing the act, to the

---

**12.** Plaintiff contends Republic failed to send CAC analyses of two tenant leases as CAC requested. However, Republic timely sent to CAC both leases involved, thus providing CAC more information than the analyses contained. Plaintiff also argues that Republic failed to forward to CAC a certain "master lease". Fortune sent the master lease to Republic by letter dated April 28, 1975, the same day CAC announced its refusal to make the third level loan.

Moreover, both before and after April 28 CAC refused to accept a "master lease" (one signed only by Armstrong and Bakewell) as meeting the contract terms for the third level loan.

**13.** Plaintiff does not equate a duty to "advocate" with a duty to guarantee, urging only Republic's duty to "advocate". However, plaintiff cites no case which would impose such a duty under the circumstances here.

age, sex, health and character of the injured party, the intelligence, standing and affluence of the tortfeasor, and other like circumstances." *Hoene v. Associated Dry Goods Corp., supra,* 487 S.W.2d at 486; *State v. Shain, supra,* 108 S.W.2d at 356.

■ A further prerequisite for an award of punitive damages is legal malice. Although actual malice in the sense of spite or ill will is not required, legal malice, or the intentional and knowing commission of a wrongful act, must be part of a plaintiff's proof in order to recover damages. *Lamb v. Amalgamated Labor Life Insurance Co.,* 602 F.2d 155 (8th Cir. 1979). *Pollock v. Brown,* 569 S.W.2d 724, 732–33 (Mo.1978); *Young v. Mercantile Trust Company National Association,* 552 S.W.2d 247 (Mo.App. 1977).

Republic's first contention is that punitive damages are precluded as a matter of law because the evidence does not show that its agent Dunaway did a wrongful act intentionally and without just case or excuse.

■ We have discussed the wrongfulness of Dunaway's actions in Part I of this opinion. In the two year period before April 28, 1975, Dunaway had worked closely with Fortune and Armstrong. He was known to them as an executive of a prominent mortgage brokerage firm. On several previous occasions he, at their request, negotiated with CAC in their favor concerning changes in the loan structure. As an expert in the field he fully realized Fortune's and Armstrong's difficult situation when at the last moment CAC refused to fund beyond the second level loan. He knew their need for new first mortgage financing made the negotiation regarding prepayment extremely important to them. After accepting their request that he act for them concerning prepayment, he not only failed to disclose Republic's actual conflict of interest but, in addition, pretended to assist his principal all the while he was engaged in a secret negotiation with CAC designed to profit Republic at the expense of his principal, Fortune. Dunaway's "self-help" approach is in principle not unlike that in *Young v. Mercantile Trust Company*

*National Association,* 552 S.W.2d 247 (Mo. App.1977). As the Court there said: "It is the bank's self-help approach that constitutes the intentional, wrongful act justifying punitive damages." 552 S.W.2d at 251.

In this case the jury could properly find that Dunaway knew of the wrongfulness of his actions but took the course that would benefit him and his employer, in spite of this knowledge. His knowledge may be inferred from surrounding circumstances, which circumstances may include evidence from which a jury could find on Dunaway's part a reckless disregard for the rights of plaintiff. *Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 722 (Mo.1966). There was no error in the award of punitive damages.

■ Republic's final contention is that the amount of the punitive damages was excessive when compared to the injury and to the amount of compensatory damages. Republic contends that amounts in excess of three times the compensatory award have traditionally been held excessive. *See Johnson v. American Mutual Liability Insurance Co.,* 335 F.Supp. 390 (W.D.Mo.1971). We do not find support for such an absolute rule in the cases of Missouri. *See State v. Shain, supra; Young v. Jack Boring's, Inc.,* 540 S.W.2d 887 (Mo.App.1976). In fact, the Missouri courts have upheld a punitive damage recovery of $4,000 where the compensatory damages were $1.00. *State v. Shain, supra.* Punitive damages must, however, bear some relation to the injury and the manner of its infliction. *Beggs v. Universal C.I.T. Corporation,* 409 S.W.2d 719, 724 (Mo.1966); *Young v. Jack Boring's, Inc., supra.*

■ Earlier in this Part III, we have cited from Missouri case law the factors which may be taken into account in passing upon the issue of whether the punitive damages assessed were excessive. Punitive damages are awarded to punish wrongdoing, as an example and deterrent to similar conduct. *Citizens Bank of University City v. Gehl,* 567 S.W.2d 423 (Mo.App.1978). In this connection the intelligence, standing, and affluence of the tortfeasor may be con-

sidered. In *Gehl, supra,* 567 S.W.2d 423, 426, the court noted that defendant, a chiropractor, was a man of "presumably high intelligence and professional standing in the community" and that his net worth was over $490,000. The court sustained a punitive damage award of $35,000. In this case, the jury could properly consider that Republic is a major national mortgage brokerage house, with offices in St. Louis, Chicago, Atlanta, Milwaukee, and Kansas City; that it acts as a correspondent for ten to twelve of the nation's largest life insurance companies; and that Republic has a net worth of approximately $4,000,000, with a gross annual income of $1,000,000. The jury could also consider, as Republic concedes, that Terry Dunaway is a knowledgeable, experienced and successful businessman (as are all the principals in this case). The *Gehl* court, as shown above, considered that factor important in assessing culpability, since knowledge and experience make such conduct as that shown here all the more unacceptable than if the wrongdoer were unsophisticated, as in *Pollock v. Brown, supra,* 569 S.W.2d at 724.

In *Hoene v. Associated Dry Goods Corp.,* 487 S.W.2d 479, 486 (Mo.1972), the court stated:

> [T]he matter of punitive damages is so "purely and peculiarly one for the jury's discretion" that only in an extreme case will the appellate court interfere. This point was raised in defendant's motion for a new trial and denied by the trial court. In view of that discretionary action we are unable to say that this part of the verdict was caused by bias and prejudice on the part of the jury.
>
> . . . We do not find from this record that the award of punitive damages was caused by "improper motives or a clear absence of honest exercise of judgment", *Beggs, supra,* hence the amount rested within the discretion of the jury, subject to review by the trial court.

Republic did not ask for a remittitur as to the punitive damages awarded, requesting instead a new trial in the trial court. The trial court refused to grant a new trial on this issue, confirming the jury award. In the record before us we find no basis upon which we, as an appellate court, can or should disturb the jury verdict concerning punitive damages.

Affirmed.