564 F.Supp. 1099 (1983)
Vaughn MORRILL, Jr., Plaintiff,
v.
BECTON, DICKINSON AND COMPANY, Defendant.
No. 81-0112-C(C).
United States District Court, E.D. Missouri, E.D.
April 22, 1983.
As Amended May 16, 1983.
*1100 *1101 John J. Cole, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiff.
Joseph J. Skram, St. Louis, Mo., James H. Marsh, Jr., Washington, D.C., for defendant.

MEMORANDUM
MEREDITH, District Judge.
This matter was tried before a jury and special verdict forms were used. On January 24, 1983, the jury returned verdicts in plaintiff's favor on his claims of breach of contract and fraud, and also found in his favor on defendant's counterclaim for breach of contract. The jury returned verdicts awarding the plaintiff damages for breach of contract in the amount of $2,125,000, damages for fraud in the amount of $3,000,000 and punitive damages in the sum of $20,000,000. The parties had earlier stipulated that the Court would determine the question of prejudgment interest to be awarded.
The Court entered judgment in accordance with the special verdict forms returned by the jury. Specifically, the Court entered judgment in favor of plaintiff and against the defendant in the sum of $2,125,000 plus prejudgment interest for breach of contract, $3,000,000 in actual damages for fraud, and $20,000,000 in punitive damages. Judgment was also entered in favor of plaintiff and against defendant on defendant's counterclaim for breach of contract. Judgment was entered on January 24, 1983.
Plaintiff subsequently filed a motion to amend the judgment in the following respects:
1. that the $3,000,000 judgment in actual damages for fraud be reduced to the sum of $875,000 to eliminate duplication of actual damages;
2. that the Court award prejudgment interest up to and including January 24, 1983 in the sum of $1,239,218 with respect to the contract damages;
3. that the Court enter an order granting plaintiff's motion for an injunction to enjoin defendant from manufacturing or selling products utilizing or embodying plaintiff's inventions after January 1, 1982 without fully and accurately reporting the *1102 proper royalties to plaintiff in accordance with defendant's contractual obligations;
4. that the Court enter an order granting plaintiff's claim for an accounting of royalties due the plaintiff after January 1, 1982 in the event defendant does not fully and accurately report the royalties due plaintiff;
5. that the Court enter an order granting plaintiff's attorneys' fees; and
6. that the Court enter an order granting plaintiff post-judgment interest at the statutory rate of nine percent (9%).
The parties have agreed that effective January 1, 1983, the interest on the unpaid balance of defendant's $285,000 loan to plaintiff, which is payable out of royalties, shall be the legal rate of nine per cent (9%) per annum instead of the stated rate of prime plus one per cent (1%). Therefore, no compensating award of interest at the higher rate with respect to such loan balance need be made.
Defendant filed a memorandum in which it agreed that this Court should reduce the fraud damages from $3,000,000 to $875,000. Defendant did not agree or consent to any of the other requests set forth in plaintiff's motion to amend judgment and did not waive any of the matters contained in its own post-trial motions.
Defendant filed a motion for judgment notwithstanding the verdict on the grounds that there is no evidence to support damages in favor of plaintiff in excess of $1,955,470. Defendant also seeks to reduce the punitive damages. Alternatively, the defendant moved for a new trial on the following grounds: that the jury verdict is against the weight of the evidence; that the amounts awarded for fraud, breach of contract, and punitive damages are grossly excessive; that the Court erred in permitting the jury to return a verdict on the issues of fraud and breach of contract; that the Court erred in failing to charge the jury that part of the plaintiff's breach of contract claim is barred by the statute of limitations; that the Court erred in failing to charge the jury that part or all of plaintiff's claim for fraud is barred by the statute of limitations; that the Court erred in declaring that the 1961 and 1970 agreements are subject to more than one interpretation in that each agreement is clear and unambiguous and that extrinsic evidence should not, therefore, have been admitted concerning the meaning of the agreements; that the Court erred in permitting the plaintiff to base its claim for breach of contract damages in some instances on the best U.S. Dealer's price rather than net sales price; that the Court erred in its charge to the jury concerning plaintiff's claim for fraud because the charge provided the jury with no guidance as to plaintiff's damages; that the Court erred in permitting punitive damages to be submitted to the jury for the reason that plaintiff sustained no damages based on fraud and that punitive damages may not be recovered for breach of contract; that the Court erred in admitting a number of plaintiff's exhibits because they were inflammatory in nature, irrelevant, without proper foundation or speculative; and that the Court erred in permitting the plaintiff, over defendant's objection, to amend his complaint to increase the punitive damages from $5,000,000 to $15,000,000, and, after the verdict, to amend the complaint to increase the prayer for punitive damages from $15,000,000 to $20,000,000.
This jury trial began on December 6, 1982 and continued through December 23, 1982 when trial recessed until January 3, 1983. Trial resumed again and continued through January 24, 1983 for a total of thirty days of trial.
Suit was filed on February 2, 1981 and was hard fought every inch of the way through and including the trial time and continues to be hard fought after trial.

Jurisdiction
Plaintiff, Vaughan Morrill ("Morrill"), is a citizen of Missouri. Defendant, Becton Dickinson and Company ("B-D") is a New Jersey corporation with its principal place of business in New Jersey. The amount in controversy, exclusive of interest and costs, *1103 exceeds $10,000. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

Statement of Facts
Briefly stated, the Court finds that the facts, as adduced by the testimony and exhibits introduced at trial, are as follows. The parties entered into a 1961 Exclusive License Agreement ("the 1961 agreement") effective May 2, 1961 which is valid and binding on both parties. The 1961 agreement provided that products commercially developed by B-D after the effective date of the agreement would be classified as "Group B" products, as to which Morrill was entitled to a 1% royalty.[1] The parties agreed that the Unopette and the Pipette portion of the Unopette when sold separately ("Pipette"), were Group B products entitled to a 1% royalty.
By letter agreement dated September 25, 1963, the parties agreed to reduce the royalty on the net sales of Pipettes and Unopettes to one-half of one percent, but on the condition that B-D pay Morrill a minimum royalty of $5,000.00 per year until such time as his royalties computed on net sales of such products would exceed such minimum.
In June of 1965 B-D and Morrill entered into negotiations with reference to a new, single licensing agreement which would grant B-D exclusive, worldwide, unlimited rights to Morrill's inventions and patent rights. The agreement was executed on April 13, 1970 but effective as of July 1, 1968 ("the 1970 agreement"). The 1970 agreement provided for royalty rates to be applied to existing products, replacement products, and new products. Specifically, the agreement provided that Morrill was to be paid a 5% royalty rate on all "new" products.
The agreement provided that new products bearing a 5% royalty rate pursuant to Article III(C) of the 1970 agreement included any product except those products listed in Article III(A) of the 1970 agreement or identical replacements of those products described in Article III(B) of that agreement.[2] The parties understood and agreed that a product which exhibited any differences in physical characteristic, dimension, inside or outside diameter, length, marking, calibration, purpose, use or function from the products B-D marketed as of July 1, 1968 would be classified as a new product and entitle Morrill to a 5% royalty.[3]
At the time of execution of the 1970 agreement, Morrill's U.S. Patent No. 3,401,028 ("028 patent") had been issued by the U.S. Patent Office as of September 10, 1968. Even though the patent was issued as to only four claims pertaining to the apparatus described in the patent application, the parties understood and agreed that for royalty purposes the 028 patent and the patent application therefor covered all of the products manufactured at B-D's Accu-Glass facility in St. Louis County, Missouri, as well as other products manufactured elsewhere that embody or include said Accu-Glass products. Moreover, the parties understood and agreed that the term "patent rights" as used in both agreements included all of Morrill's inventions disclosed in the patent application as well as the claims which were granted by the Patent Office.
The parties understood and agreed at the time they executed the 1970 agreement that the royalty period applicable to products manufactured at the Accu-Glass facility would be the 17-year statutory term of the *1104 028 patent. The 028 patent expires on September 10, 1985. In the event an invention of Morrill's was furnished to and used by B-D but B-D elected not to seek a patent, the 17-year term also applied. A great deal of the machinery used by B-D and which is still being used by B-D, are improvements on the 028 patent for which no application was made.
The five year royalty period set forth in Article III-D of the 1961 agreement and Article III(E) of the 1970 agreement applied only to Morrill's inventions for which either party applied but did not receive any patent claims issued by the Patent Office. This never happened and therefore none of Morrill's inventions fell into this category.
B-D contended during trial that it was unaware of the fact that it was not using and had not used the 028 patent since the late 1960's because the compensator which had been a part of the patent was not used in manufacturing the glass tubing. This contention is totally belied by the evidence. The evidence reflects that B-D knew as early as the late 1960's that it was not practicing the "claims" of the 028 patent in the strict patent law sense because it knew that it was not using the compensator which was included in Morrill's 028 patent. However, the parties agreed that the glass-making technology was a new and valuable asset to B-D which made it millions of dollars.
From the end of 1968 until after this suit was filed, B-D marked and advertised various products it manufactured at its Accu-Glass plant with Morrill's 028 patent number. Moreover, it represented to other companies that it was practicing Morrill's 028 patent.[4] Other evidence reflected that B-D was not interested in manufacturing an electronic reed-switch perfected by Morrill. However, in the 1971 Morex negotiations, B-D insisted that Morrill enter into a license agreement and pay B-D royalties arising from his manufacture of reed-switches utilizing this technology. Again, in 1979, B-D required General Instruments to pay royalties to B-D for General Instrument's utilization of Morrill's technology. Under these circumstances, it is too late for B-D to contend that the patent did not cover the apparatus which they were using and that the 17-year royalty period did not apply.

Plaintiff's Breach of Contract Claim
B-D contends as its first ground of error that the 1961 and 1970 contracts are clear and unambiguous and that the Court erroneously admitted parol evidence at trial for the purpose of interpreting the contracts. The question of whether or not the contracts are clear and unambiguous is best represented by the fact that when Mr. Rodrick, B-D's present counsel, first examined the 1961 and 1970 documents, he advised his clients as follows:
"The metes and bounds of this Agreement are quite clouded by the definition of the term `Inventions' as set forth in this Agreement. From the actual letter of the Agreement, it is difficult to determine the intent of the parties, not only in defining `Inventions', but also new products."
However, upon ascertaining the clear intent of B-D's management, Rodrick re-examined the documents and suggested a way in which to avoid paying 5% royalties on new products. Rodrick's new interpretation of the contracts was that the 1970 Agreement applied only to the products listed in Article III(A) of that agreement and that all other products were covered by the 1961 Agreement, which contained a 1% maximum royalty rate applicable to Group B products.[5]
*1105 Rodrick's current interpretation of the contracts directly conflicts with that of William H. Webster, who was attorney for the plaintiff up to the date he was appointed to the Bench in the Eastern District of Missouri, and Mr. Henry W. Supplee, B-D's attorney at the time the 1961 and 1970 Agreements were negotiated and signed. Webster was plaintiff's counsel during the negotiations for the 1970 Agreement and Webster's firm helped draft the 1961 Agreement. In view of the conflicting interpretations of the contracts in question, this Court held, after reading the documents themselves, that the contracts are ambiguous and that the jury should determine the intent of the parties.
The Court finds that the jury correctly interpreted the meaning of the contracts. B-D's former counsel who negotiated the 1970 Agreement emphatically states the Agreement provides for 5% royalty on new products and that if there is any change in the marking, length, o.d. or i.d., it becomes a new product bearing a 5% royalty rate. During Henry Supplee's direct testimony, he was shown plaintiff's Exhibit No. 180, which was a memorandum written by him, dated October 14, 1971, to R. Van Orden, regarding the Morrill/B-D License Agreement of July 1, 1968. This memo states:
"Based upon the description of products in your memo of October 11th to Bob Butler, these would be `new products' under Article III-C of the license agreement, subject to the five percent royalty rate."
Mr. Supplee was asked: "Did you ever change your belief and understanding that the variations in marking, length, o.d., i.d. would qualify it as a new product?" He answered, "[M]y response of October 14, 1971 is as I read it and I have no reason to change my opinion. I know of nothing as of today that would change that opinion." This is not the application that B-D has been applying to the Agreements nor is it the basis on which they have been paying royalties to Morrill. The jury correctly interpreted the meaning of the contracts.
Defendant also contends that the Court erred in allowing Morrill to use the lowest or best U.S. Dealer's sale price ("BUSDP") as a basis for his contract damage calculations rather than the net sales price. It is true that the contract stated that the net sales price was to be used. However, the record is clear that B-D initiated the concept of applying the BUSDP as a simpler method of calculating royalties.[6] As a matter of fact, B-D had drafted a contract which would have changed the method of calculating the amount of royalties from net sales to BUSDP and had advised Morrill that this method would be fair and equitable to both parties. Moreover, the BUSDP is the lowest dealer sale price based on large quantities of glass and is, therefore, usually lower than the net sales price.
Finally, B-D contends that the jury's award of actual damages is excessive. The jury's award of damages in the sum of $2,125,000 under the circumstances, facts and evidence in this case is not excessive and is substantiated by the evidence. The damage exhibit presented by plaintiff showed actual damages on royalties in the amount of $1,955,470. However, the evidence is clear that this figure omitted certain items which the plaintiff was unable to ascertain and, in addition, was conservatively calculated.
Specifically, the evidence reflects that in calculating the damages the plaintiff prorated the glass to the entire kit and calculated royalties only on the glass portion of the kit. The contracts, however, provided for payment of royalties on the entire kit. Second, plaintiff was unable to locate or allocate prices for nearly nineteen tons of glass and over four million pieces of glass. Third, plaintiff applied the BUSDP in effect at the time the glass was shipped from *1106 the Accu-Glass facility and not when it was ultimately sold by the dealers. During the inflationary period from 1968-1981, this method of computing damages was very conservative. Fourth, plaintiff used the BUSDP in computing its damages, which is usually lower than the net sales price. Finally, Morrill suffered losses of royalties due to B-D's failure to market the clinical thermometer tubing and QBC tubing in accordance with its plans during the pendency of, and because of this lawsuit. This Court finds no fault with the jury's finding that plaintiff sustained damages under the contract in the sum of $2,125,000.

Plaintiff's Fraud Claim
The defendant argues vigorously that the most plaintiff is entitled to recover under the facts in this case are damages for breach of contract and that, under no reading of the facts, can this be converted into a fraud claim. It is true that a claim for damages under breach of contract is not synonymous with a claim for fraud. However, the fact that plaintiff's cause of action for fraud arises out of the parties' contractual relationship does not preclude his fraud action so long as plaintiff carries his burden of proving the essential elements of fraud. The facts and evidence in this case amply support plaintiff's claim for fraud.
The Eighth Circuit has recognized that one may plead and prove alternate theories of recovery. In Re King Enterprises, Inc., 678 F.2d 73, 77 (8th Cir.1982). Moreover, it is well-settled law that one may recover under both breach of contract and fraud theories if plaintiff establishes an independent tort. In Peitzman v. City of Illmo, 141 F.2d 956, 961 (8th Cir.), cert. denied, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944), the Court stated:
"[T]orts may be committed in the non-observance of contract duties. Liability in tort may indeed co-exist with a liability in contract toward the same person where, independently of the contract, there is a duty which has been violated. Conduct that is merely a breach of contract is, of course, not a tort. However, a contract may establish a relationship and failure to exercise proper care or tortious and intentional wrong in performing it may give rise to a tort liability which is not defeated because there was a contract."
W. Prosser, Law of Torts, § 92 (4th Ed., 1971) defines "nonfeasance" as the "complete non-performance of a promise which in the ordinary case is a breach of contract only." "Misfeasance", on the other hand, includes the defective or fraudulent performance of a duty for which one is liable in tort. Missouri courts follow the nonfeasance/misfeasance distinction described by Prosser. Peitzman v. City of Illmo, supra; Harzfeld's, Inc. v. Otis Elevator Co., 114 F.Supp. 480, 484 (W.D.Mo.1953).
The evidence in this case clearly supports plaintiff's cause of action for fraud. B-D's deliberate and wrongful conduct in this case is reflected, in part, by the following facts. From 1968-1980 B-D intentionally misrepresented royalties due to Morrill by assigning a lower rate categorically to new products when B-D was well aware that they should have been paid at a 5% rate. Instead, B-D paid at either a 1 or 1½% rate. In computing many of the royalties, B-D applied the intercompany transfer price of standard manufacturing cost instead of net sales, as required by the contracts. Quantities and prices were concealed from Morrill continuously from 1969 through 1980 via quarterly royalty statements that under-reported and under-paid royalties due Morrill. The evidence reflects that B-D knew the reports were in error or knew that it did not know whether they were in error.
In late 1969 and early 1970, B-D's top officers, including Howe (now chairman of the Board) and Asnes (now President of the company), made a secret unilateral decision to pro-rate royalties due on the net sales of Unopettes and to withhold this decision from Morrill. This decision was made in spite of the advice given by B-D's legal department that there was no basis for this position. In addition, from 1970-1973 B-D continued to pay Morrill the $5,000 annual *1107 minimum royalty for its net sales of Unopettes and Pipettes despite the fact that B-D's sales of such products from 1970 on entitled Morrill to several times the minimum royalty. Moreover, B-D withheld this fact from Morrill and misrepresented its sales of said products to Morrill.
In late 1979 B-D discovered it had not paid Morrill royalties owed him since 1975 on a large group of "new products" as to which a 5% royalty rate applied. B-D unilaterally decided, without advising Morrill, to reduce the royalty rate to 1% and paid Morrill on that basis. In April of 1980 B-D decided that it would reduce Morrill's royalties on all new products, regardless of configuration, to 1% from 5%. This decision was made after B-D's marketing plans and projections showed that there would be substantial sales of two new products to be manufactured by Morrill's process, namely clinical thermometer tubing with estimated sales of $10,000,000 and QBC tubing with estimated sales of $4,000,000 by 1983. B-D again agreed to keep this decision secret from Morrill. In addition, B-D also decided at that time to pro-rate Morrill's royalties on all products and to pay him only for the components made at Accu-Glass. Again, this decision was not in accordance with the Agreement and Morrill was not informed.
In making these decisions, B-D took advantage of Morrill's shaky financial condition and of the fact that Morrill owed B-D $285,000 on a note which was to be paid out of royalties due Morrill. B-D continued to manufacture and sell products utilizing Morrill's inventions, his patents, his apparatus, and has not paid any royalties to Morrill since this suit was filed.
The evidence also amply supports the jury's findings that Morrill performed all of his obligations under the contract, that he relied upon B-D's misrepresentations that royalty payments were being paid in accordance with the contracts, and that his reliance was reasonable. When Morrill made inquiry concerning certain items which he thought reflected discrepancies, he had reason to believe that B-D was honestly and properly paying the correct amount of royalties. It was not until shortly before this suit was filed that Morrill realized and his attorneys discovered that the representations which B-D made to Morrill were false. The jury was shown the various documents as they were introduced into evidence and they had an opportunity during the long trial to become familiar with the "inflammatory" documents which were taken from B-D's own files. These documents showed in no uncertain terms that it was the intent and purpose of B-D and its principal officers to misrepresent the amount of royalties being paid to Morrill and to take advantage of him.
From time to time during the trial, B-D's attorney would ask Morrill whether he ever availed himself of the opportunity to examine B-D's books and records to discover whether the royalties were being properly paid. This sounds very simple but the truth of the matter is that B-D's records were kept in such a fashion that even B-D's own accountant would not render a written opinion as to whether or not the royalties were properly paid unless B-D was willing to represent to the accountant that it had shown the accountant all of the necessary documents and that nothing had been withheld from him. In effect, B-D's own accountant would render a written opinion that all the royalties were properly paid only if B-D indemnified the accountant if an error was made. In sum, Morrill did all he could reasonably be expected to do to discover the discrepancies in the royalty payments.
All of the foregoing facts amply support Morrill's claim for fraud. The jury was fully advised of the duplicative nature of plaintiff's actual damages for breach of contract and fraud and the Court believes that the jury carefully awarded the full amount of damages it believed related to the separate claims. The Court is of the opinion that the damages for fraud and contract are duplicitous to some extent and that the $3,000,000 awarded in the fraud claim should be reduced by the $2,125,000 awarded in damages under the contract claim. Therefore, the Court will reduce the *1108 damages on the fraud claim to $875,000. The plaintiff in his damage calculations initially made a conservative estimate as to the royalties that were due. Because of the manner in which the records of B-D were concealed from Morrill and from his attorneys, B-D cannot now claim that the plaintiff overstated damages or that the jury awarded damages without any foundation. There is sufficient evidence in the record for an award of $875,000 damages for fraud.

Punitive Damage Award
It is well-settled law in Missouri that punitive damages are recoverable for a cause of action sounding in tort if the evidence supports a finding of either legal or actual malice. Labrier v. Anheuser Ford, Inc., 621 S.W.2d 51, 58 (Mo. en banc 1981). In addition, because the purposes underlying actual and punitive damage awards differ, Missouri courts do not require a fixed percentage or relation between the amount of actual and punitive damage awards. See Armstrong v. Republic Realty Mortgage Corp., 631 F.2d 1344, 1352 (8th Cir.1980); Labrier v. Anheuser Ford, Inc., supra; Hoene v. Associated Dry Goods Corp., 487 S.W.2d 479, 486 (Mo.1972); Holcroft v. Missouri-Kansas-Texas R.R., 607 S.W.2d 158 (Mo.App.1980). However, the punitive damage award must bear a reasonable relation to the injury inflicted on the plaintiff and the manner in which it was inflicted. Schmidt v. Central Hardware Co., 516 S.W.2d 556, 560 (Mo.App.1974).
The Court finds that the jury's award of $20,000,000 in punitive damages, upon the facts of this case, is entirely reasonable. The evidence reflects that B-D intentionally and with malice undertook to defraud plaintiff of royalties which were rightfully his. In addition, B-D is a company which does business worldwide. Plaintiff introduced into evidence B-D's annual report for the fiscal year 1982. It disclosed that B-D's net sales during the year 1982 amounted to $1,113,921,000. Its net income that year was $76,692,000. In 1982 the defendant's total assets were $1,089,615,000 and it had a net worth of $585,080,000. The purpose of punitive damages is to punish a defendant who maliciously wrongs a plaintiff. The evidence overwhelmingly reflects that the defendant did so in this particular case. The $20,000,000 punitive damage award is reasonable in light of the injury inflicted on the plaintiff and the manner in which it was inflicted. Moreover, the award is less than seven times the amount of actual damages which the plaintiff sustained as a result of B-D's fraud.
B-D argues that because this Court is remitting the actual damage award it must also remit the punitive damage award. Defendant cites Ogilvie v. Fotomat Corp., 641 F.2d 581 (8th Cir.1981) and Senn v. Manchester Bank of St. Louis, 583 S.W.2d 119 (Mo. en banc 1979) in support of this argument. The Court does not find these cases persuasive as applied to the facts of the present case. In Ogilvie and Senn there was evidence which indicated that the jury intended to award punitive damages on a percentage basis. Therefore, the courts remitted the punitive damages together with the remittiturs in actual damages so that the percentage between the awards would remain the same.
The instant case is more similar to Armstrong, supra, wherein the district court reduced the $75,000 compensatory damage award to $14,000. The Eighth Circuit affirmed the district court's reduction of compensatory damages but upheld the jury's punitive damage award of $125,000 on the grounds that the award was, under the circumstances, reasonable. As in Armstrong, this Court finds no basis to set aside or reduce the punitive damages awarded herein. See also Labrier, supra wherein the Supreme Court of Missouri upheld a punitive damage award of $32,000 although it remitted the judgment of $10,000 actual damages to $1 nominal damages for failure of proof.

Statute of Limitations
Defendant contends that the Court erred in not instructing the jury as to the alleged applicability of the five year statute *1109 of limitations under § 516.120 Mo.Rev.Stat. with respect to plaintiff's breach of contract and fraud claims. Defendant alleges that the statute would bar plaintiff from recovering some of the damages awarded to him. This Court does not agree.
In view of the fact that Morrill's relationship with B-D was of a continuous nature, § 516.100 Mo.Rev.Stat. provides that no statute of limitations may be deemed to have commenced with respect to any of plaintiff's theories. That statute provides that no statute of limitations may be determined to have commenced when the wrong is done or the technical breach of contract or duty occurs, but when the damages resulting therefrom are sustained and capable of ascertainment, and if more than one item of damage, then the last item, so that all resulting damage may be recovered and full and complete relief obtained.
In the present case, Morrill was not able to discover B-D's fraud until sometime in 1978 or 1979. Moreover, the last item of damage under both of plaintiff's theories did not occur until shortly before this suit was filed. Therefore, the statute of limitations does not bar plaintiff from recovering damages under either of his causes of action. Sabine v. Leonard, 322 S.W.2d 831 (Mo. en banc 1959). See also, Smith v. Smith, Barney, Harris, Upham & Company, 505 F.Supp. 1380, 1391 (W.D.Mo.1981).

Introduction of Exhibits into Evidence
Defendant contends that the Court erred by admitting certain documents which were prejudicial or privileged. These contentions are without merit. The only "inflammatory" exhibits which were admitted were documents prepared by B-D's own people reflecting B-D's willfulness in reducing Morrill's royalty payments without notifying him and without any basis on which to do so.
The Court did permit certain documents to be released to the plaintiff to which defendant claimed the attorney-client privilege. However, the Court specifically found that the attorney-client privilege relative to these documents had been waived. As a matter of fact, B-D's former general counsel, Henry A. Supplee, testified at length in plaintiff's case with respect to the subject matter of these documents without any objection whatsoever by the defendant. For all of the foregoing reasons, defendant's motion for a judgment notwithstanding the verdict and alternative motion for a new trial will be denied.

Injunctive Relief and an Accounting
Plaintiff has asked the Court to enjoin the defendant from manufacturing and selling products utilizing or embodying plaintiff's inventions after January 1, 1982, unless the defendant fully and accurately accounts for and pays the royalties due to plaintiff. Plaintiff further asks the Court for an accounting of royalties due plaintiff after January 1, 1982 in the event defendant does not fully and accurately account for and pay to plaintiff the royalties due him. While the plaintiff will undoubtedly suffer hardship from the exhaustion of his own assets, this Court is of the opinion that the proper procedure is to permit the defendant to appeal the judgment and, if it desires, to stay execution on the judgment upon posting a proper bond. The Court will retain jurisdiction and reserve ruling on the accounting and injunctive relief until after the appeal has been completed.

Attorney's Fees
Plaintiff seeks an award of attorney's fees in the sum of $411,190. The plaintiff bases his request for attorney's fees on the ground that defendant's conduct in litigating this case amounted to bad faith.
The facts pertinent to plaintiff's motion are as follows. Defendant filed its answer to plaintiff's complaint and counterclaims on March 25, 1981. In counterclaim No. 1, defendant sought a declaratory judgment that the 028 patent was invalid and/or was not infringed. Defendant alleged in Counterclaim No. 2 that Morrill owed B-D royalties which B-D mistakenly paid to Morrill. On June 8, 1981, plaintiff filed a motion to *1110 dismiss counterclaim No. 1. This motion was extensively briefed and affidavits were filed. The Court denied this motion on October 30, 1981. On September 1, 1982, defendant filed its third counterclaim. In that counterclaim, B-D alleged that Morrill had wilfully breached the contracts and sought punitive damages from the plaintiff in the sum of $5,000,000. On November 16, 1982, B-D filed a motion to dismiss its counterclaim No. 1 against the plaintiff without prejudice. On November 24, 1982, the Court issued an order dismissing defendant's counterclaim No. 1 with prejudice.
On January 23, 1983, during the last day of the jury instruction conferences, defendant moved the Court to dismiss its counterclaim No. 2 without prejudice. On January 24, 1983, the defendant moved the Court to dismiss without prejudice that portion of its counterclaim No. 3 sounding in fraud. On January 24, 1983, the Court dismissed defendant's counterclaims numbered 2 and 3, with prejudice.
In testimony outside the presence of the jury, the plaintiff testified that because of this lawsuit, he had been forced to put a second mortgage on his home and had exhausted all of his financial resources. As a matter of fact, plaintiff's attorney had stopped charging attorney's fees because he was aware that plaintiff was unable to pay them. Defendant had stopped paying royalties to plaintiff after this suit was filed in February of 1981. This Court reserved ruling on the motion at that time.
In its motion for attorney's fees, plaintiff's attorneys charged fees ranging from $44 an hour to $132 an hour. The rates reflected the respective experience and qualifications of the lawyers involved. Plaintiff's claim for attorney's fees does not include two hundred to three hundred hours of unbilled time of Messrs. Quinn and Cherrick. The fees requested are reasonable and consistent with the Eighth Circuit's guidelines set forth in Allen v. Amalgamated Transit Union Local 788, 554 F.2d 876 (8th Cir.), cert. denied, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977) and Avalon Cinema Corp. v. Thompson, 689 F.2d 137 (8th Cir.1982). Another $10,000 to $25,000 could have been added to the bill for the two to three hundred hours of unbilled time not charged to the plaintiff.
Plaintiff urges the granting of attorney's fees on the theory that defendant has litigated this case in bad faith, wantonly, vexatiously and for oppressive reasons. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The Court is cognizant of the fact that defendant had no evidence to support its counterclaims and agrees that there is some merit to plaintiff's position. However, in light of the punitive damage award made by the jury, the Court declines to award attorneys fees as well.

Prejudgment and Postjudgment Interest
Section 408.020 of the Revised Statutes of Missouri provides that creditors shall be allowed interest at the rate of 6% per annum on accounts after they become due. This statute was amended in 1979 to raise that rate to 9%, effective September 29, 1979. Section 408.040 of the Revised Statutes of Missouri provides that plaintiff shall be allowed post-judgment interest on his claims at the rate of 9%.
The judgment will be amended to show prejudgment interest in the sum of $1,239,218 on the jury award of $2,125,000 on the breach of contract claim.
Judgment will be entered in accordance with the foregoing memorandum. Costs in accordance with the plaintiff's cost bill in the amount of $22,993.87, which defendant has not objected to, will be assessed against the defendant.

On Application For Permanent Injunction
This matter is before the Court upon plaintiff's motion to amend judgment by granting plaintiff's application for a permanent injunction, upon plaintiff's motion for leave to dismiss Count III of plaintiff's second amended complaint, and upon plaintiff's motion for clerical corrections. For the reasons set forth below, the motions will be granted.
*1111 On January 24, 1983, after a six-week trial, the jury returned verdicts in plaintiff's favor on his claims of breach of contract and fraud, and also found in his favor on defendant's counterclaim for breach of contract. The Court entered judgment in accordance with the jury's findings in the special verdict form and, on April 22, 1983, amended that judgment in accordance with the jury verdict and a memorandum of the Court dated that date.
In conjunction with the legal issues submitted to the jury, plaintiff also sought equitable relief in the form of a permanent injunction. Plaintiff requested injunctive relief in an effort to prevent defendant from: (1) withholding royalty payments due to plaintiff arising out of defendant's continuing sales of products manufactured at its Accu-Glass facility, and elsewhere, after January 1, 1982, which products embody plaintiff's "inventions" and/or "patent rights" as those terms are used in the May 3, 1961 Exclusive License Agreement, as amended, and in the April 13, 1970 Exclusive License Agreement, as amended ("the Agreements"); and (2) advertising or otherwise representing to the public that the precision bore glass-making process being used by defendant and/or its Accu-Glass Division to manufacture precision bore glass tubing products is defendant's proprietary process or is owned by defendant and/or that products manufactured by defendant at its Accu-Glass Division are manufactured by a process proprietary to or owned by defendant unless proper royalties are paid to plaintiff.
In the judgment and memorandum dated April 22, 1983, this Court declined to rule on plaintiff's motion for injunctive relief and reserved ruling on the issue until after the appellate process is completed. However, because of potential problems concerning finality of the judgment under 28 U.S.C. § 1291, this Court will amend its earlier ruling and render a final judgment on the merits of plaintiff's claim for a permanent injunction.
Plaintiff herein seeks injunctive relief to enforce his rights under the Agreements by preventing future violations of said rights. This Court is empowered to grant injunctive relief pursuant to Fed.R. Civ.P. 65 upon a showing of irreparable harm and an inadequate remedy at law. See Beacon Theatres v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 954-55, 3 L.Ed.2d 988 (1959). This test is satisfied, and injunctive relief is appropriate, where there is a likelihood of recurrent violations of plaintiff's rights resulting in continuing injury to him. United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); Dyer v. Securities & Exchange Commission, 291 F.2d 774, 780-81 (8th Cir. 1961). This Court is of the opinion that, under the facts and circumstances of this case, injunctive relief is appropriate.
The facts, as more fully set forth in this Court's judgment order and memorandum thereto dated April 22, 1983, reflect that defendant knowingly and wilfully withheld royalty payments due plaintiff under the terms of the Agreements. Moreover, defendant engaged in a course of conduct wherein it intentionally misrepresented royalties due plaintiff and repeatedly attempted to deceive and take advantage of him. The jury awarded damages to plaintiff for the time period ending December 31, 1981. However, defendant will continue to utilize and commercially exploit plaintiff's inventions and patent rights and has a continuing obligation to pay plaintiff royalties under the terms of the Agreements until September 10, 1985. Without the issuance of an injunction, it is clear that there exists a danger of recurrent violations of the Agreements. This danger is more than a mere possibility. Cf. United States v. W.T. Grant Co., supra.
To allow defendant to continue to withhold royalties accruing after January 1, 1982, while making and selling products under the protection of the Exclusive License Agreements, would be unfair, inequitable and would cause plaintiff further injury. An injunction will prevent defendant from further utilizing and commercially exploiting plaintiff's inventions and patent rights without payment therefor as required by *1112 the Agreements. Accordingly, plaintiff's motion for injunctive relief will be granted. However, this injunction will be stayed pursuant to Fed.R.Civ.P. 62, pending resolution of the appellate procedure.
Plaintiff has also moved to dismiss Count III of its second amended complaint wherein it seeks an accounting. As grounds therefor, plaintiff contends that these issues are moot and might affect the finality of this Court's judgment and memorandum opinion dated April 22, 1983. Count III of plaintiff's second amended complaint will be dismissed without prejudice.
Finally, pursuant to Fed.R.Civ.P. 60(a), plaintiff has filed a motion for clerical corrections in the judgment and memorandum opinion dated April 22, 1983. The Court is of the opinion that the requested corrections and modifications will clarify the final judgment. The Court will make the corrections in accordance therewith.
NOTES
[1] Products commercially sold by B-D as of the effective date of the agreement were labelled "Group A products", as to which Morrill received lesser royalties.
[2] In essence, the 1961 agreement applies only to the sale of Unopettes and Pipettes. The 1970 agreement applies to all other B-D products as to which royalties are owed. In addition, no products manufactured and sold by B-D after July 1, 1968 constitute "replacement" products as that term is used in the 1970 agreement because no products listed in Article III(A) were replaced.
[3] Despite B-D's vigorous protest in its post-trial motions, this interpretation of the contract is amply borne out by the testimony of William H. Webster and Henry W. Supplee, the attorneys who negotiated the agreement.
[4] In 1974, a large West German glass manufacturer requested that Morrill sub-license his patent processes to it. This letter was turned over to B-D, who advised the German firm that it was not interested in sub-licensing the patent.
[5] B-D has apparently suggested a new interpretation of the contracts in its post-trial motions. It now contends that Morrill's products are covered by Article III(B) of the 1970 Agreement as "replacement" products. This new interpretation is simply not supported by the evidence.
[6] The problem with using the net sales price is that it requires examination of a multitude of records throughout the United States before it can be determined. The BUSDP was the most reasonable method available to plaintiff to determine damages.