**Vaughan MORRILL, Jr., Appellee/Cross-Appellant,**

v.

**BECTON, DICKINSON AND COMPANY, Appellant/Cross-Appellee.**

Nos. 83–1687, 83–1731.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1984.

Decided Nov. 8, 1984.

Rehearing and Rehearing En Banc Denied Dec. 14, 1984.

---

Arthur L. Liman, New York City, for appellant/cross-appellee.

John J. Cole, St. Louis, Mo., for appellee/cross-appellant.

Before McMILLIAN, BENNETT * and ARNOLD, Circuit Judges.

McMILLIAN, Circuit Judge.

Becton, Dickinson & Co. (B–D), a New Jersey corporation, appeals from a final judgment entered against it in the district court[1] in the amount of $3,000,000 actual damages and $20,000,000 punitive damages. Judgment was entered on jury verdicts in favor of Vaughan Morrill, Jr., an inventor and resident of Missouri, in his action for unpaid royalties due under patent license agreements and for actual and punitive damages for fraud. The jury awarded Morrill $2,125,000 actual damages on the breach of contract claim and $3,000,000 actual damages on the fraud claim. On Morrill's motion, the district court reduced the actual damages for fraud to $875,000 to eliminate duplication of actual damages. B–D argues that the district court's judgment should be reversed because (1) the jury adopted an unreasonable interpretation of the agreement, (2) the elements of fraud were not established, (3) the awards of actual damages were not supported by the evidence, (4) the statute of limitations bars recovery of part of the actual damages awarded, and (5) the punitive damages award is excessive. In a cross-appeal, Morrill argues that the district court erred in denying his motion for attorney's fees for B–D's bad faith conduct in filing counterclaims. For the reasons discussed below, we modify the actual damages to $2,125,000 and hold that the judgment for punitive damages should be affirmed, provided Morrill accepts a remittitur reducing punitive damages to $3,000,000. We affirm the district court's denial of Morrill's motion for attorney's fees.

---

* The Honorable Marion T. Bennett, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

1. The Honorable James H. Meredith, United States Senior District Judge for the Eastern District of Missouri. The district court's opinion is reported at 564 F.Supp. 1099 (E.D.Mo.1983).

B–D is a company engaged in the business of manufacturing, marketing and developing a variety of health-care instruments and apparatus comprised of uniform precision-bore glass tubing. Morrill is an inventor in the field of glass technology. On May 3, 1961, the parties entered into an Exclusive License Agreement whereby Morrill granted B–D exclusive rights to Morrill's inventions and patent rights in return for royalty payments in varying percentage amounts of the net sales of various products, payable on a quarterly basis. Morrill was to receive a 1% royalty on "Group B" products, which were products commercially developed by B–D after the effective date of the agreement. By letter agreement dated September 25, 1963, Unopette disposable pipettes, a B–D product which includes a capillary tube as a component part, was specifically added as a "Group B" product. The parties agreed to reduce the royalty on the net sales of Unopettes to ½% on the condition that B–D pay Morrill a minimum of $5,000 per year until such time as his royalties computed on net sales of said product would exceed this minimum.

On April 13, 1970, the parties entered into a new licensing agreement giving B–D exclusive rights to Morrill's inventions and patent rights and providing for royalty payments as follows: 1%–2% of net sales of certain named listed products or "any new Product which replaces any of the Products listed," and 5% of net sales of any other new product. The agreement provided for a five-year royalty period as to products embodying Morrill's unpatented inventions and for a royalty period co-extensive with the effective life of Morrill's patent rights (*i.e.*, until September 1985) as to products embodying those patents. The second agreement also provided that it did not include those inventions covered by the 1961 agreement which was to remain in effect.

Use of Morrill's technology enabled B–D to capture over 90% of the world market for precision-bore glass tubing principally used in the health-care industry. Over the years, B–D's royalty statements to Morrill contained factual inaccuracies as to price, quantity of sales and classification of products resulting in underpayments to Morrill. In the late 1960's, B–D knew that Unopette sales were generating royalties in excess of $5,000 per year, yet payments to Morrill remained at that minimum amount. In 1970 B–D unilaterally adopted a new interpretation of the 1961 agreement as amended, whereby only the capillary tube portion of Unopettes was subject to royalty payments. B–D accordingly prorated the royalties owed Morrill on Unopette sales, with the result that the $5,000 yearly minimum was not exceeded for any past year. Morrill was not informed of this decision until February 1971. In October 1971, B–D granted Morrill a limited sub-license to use his inventions and patents to manufacture a certain non-health-care industry product. At this time Morrill agreed in writing to the pro-rata method of calculating Unopette royalties.

In late 1979, B–D, faced with the prospect of having to pay Morrill sizable royalties on two new products, requested its in-house counsel to review B–D's obligations to Morrill under the license agreements. Counsel advised that the five-year royalty clause in the 1970 agreement could be read to apply to these products because "patent rights," strictly construed, were not in fact being used in producing them. This position, which would mean termination of royalty payments on many products, was not adopted by B–D. Rather, in early 1980, B–D adopted the position that the 1% royalty rate of the 1961 agreement, rather than the 5% rate of the 1970 agreement, covered certain products and, without informing Morrill of this decision, began assigning the lower royalty rate to the products. At the same time B–D assigned the lower rate to products it had, by oversight, failed to pay royalties on since 1976.

Morrill initiated the present lawsuit in February 1981. Count I alleged breach of contract on the part of B–D and sought the amount of royalties actually due him under the license agreements. Count II alleged that B–D's reporting inaccuracies and mis-

representations of the amount of royalties due were willful and intentional in breach of B–D's fiduciary duty, and that Morrill justifiably relied on the misrepresentations and was damaged thereby. Morrill sought actual and punitive damages under Count II. B–D asserted three counterclaims against Morrill, all of which were dismissed on B–D's motions prior to or during trial.

At trial each side introduced evidence to support its interpretation of the license agreements and B–D's obligations thereunder. B–D's position was that (1) the five-year royalty clause in the 1970 agreement applied to many products because "patent rights" were not in fact being used in producing those products, (2) the 1961 agreement with its lower royalty rates, and not the 1970 agreement, covered many of B–D's products, based on the exclusionary clause in the 1970 agreement which provided that the term "inventions" as used in that agreement shall not include those inventions covered by the earlier agreement, and (3) under the 1970 agreement, certain products were "replacement" products subject to a 1%–2% royalty rate, and not "new" products subject to the 5% royalty rate.

Morrill presented evidence that it was the understanding and intent of both parties that (1) the royalty period co-extensive with the life of his patent rights was the applicable royalty period under the 1970 agreement on all B–D products involved in this action, (2) following the effective date of the 1970 agreement, the royalty rates in the 1961 agreement only applied to Unopettes, and (3) under the 1970 agreement, "replacement" products referred to a very narrow class of products, including none of the products involved in this case.

The jury, by special verdict forms, awarded Morrill damages for breach of contract in the amount of $2,125,000, damages for fraud in the amount of $3,000,000, and punitive damages in the amount of $20,000,000. The district court entered judgment accordingly, awarding pre-judg-

ment interest on the contract damages. Subsequently, on Morrill's motion, the district court reduced the damages for fraud to $875,000 to eliminate duplication of actual damages. The district court also denied Morrill's request for attorney's fees in the amount of $411,190. B–D appealed from the judgment against it for actual and punitive damages, and Morrill appealed the denial of attorney's fees.

As part of the final judgment entered in favor of Morrill, the district court enjoined B–D from (1) withholding royalty payments due Morrill arising out of B–D's continuing sales, after January 1, 1982, and until September 10, 1985, of products embodying Morrill's inventions or patent rights as those terms were interpreted by the jury verdict and by the judgment and memorandum opinion of the district court, and (2) representing to the public that the process being used to manufacture its precision-bore glass tubing products is B–D's proprietary process, unless proper royalties are paid to Morrill. The district court stayed the injunction pending completion of appeals to this court. *Morrill v. Becton, Dickinson & Co.*, No. 81–0112–C(C) (E.D.Mo. May 16, 1983). On May 29, 1984, this court issued an order lifting the stay and restoring the injunction during pendency of the appeals or until further order of the court. *Morrill v. Becton, Dickinson & Co.*, Nos. 83–1687 and 83–1731 (8th Cir. May 29, 1984). We turn now to the appeal and cross-appeal before us.

*Breach of Contract Claim*

B–D first argues that the jury should not have been permitted to consider and adopt Morrill's interpretations of the replacement product/new product provision and the royalty period provision of the 1970 agreement because the clear and unambiguous language of the agreement permits only B–D's interpretations of these provisions.[2] We rule this point against B–D. The meaning of these agreement provisions was not so clear and unambiguous as to

---

**2.** B–D does not challenge the jury's adoption of Morrill's position that the 1961 agreement's roy-

alty rates applied only to Unopettes.

preclude consideration by a jury of external facts and circumstances to case light on the intent of the parties. *See Modine Manufacturing Co. v. Carlock,* 510 S.W.2d 462, 467–68 (Mo.1974); *Busch & Latta Painting Corp. v. State Highway Comm'n,* 597 S.W.2d 189, 197–98 (Mo.Ct.App.1980). We further hold that there was ample evidence, including the testimony of B–D's and Morrill's attorneys who had negotiated the agreement, to support the jury's interpretation of the agreement and that such interpretation is not unreasonable or repugnant to the language of the agreement.

### Fraud claim

 B–D next argues that Morrill's fraud claim, and therefore his claim for punitive damages, should not have been submitted to the jury. It is clear that under Missouri law, liability in tort may co-exist with liability in contract arising out of the same events. *United Industrial Syndicate v. Western Auto Supply Co.,* 686 F.2d 1312, 1317 (8th Cir.1982); *Peitzman v. City of Illmo,* 141 F.2d 956, 961 (8th Cir.), *cert. denied,* 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944). We therefore focus on B–D's argument that the evidence was insufficient to prove the elements of fraud.[3]

 Under Missouri law the elements of fraud are a misrepresentation, its falsity, the maker's knowledge of its falsity, the maker's intent that it should be acted upon by the other person and in the manner reasonably contemplated, and the other person's ignorance of its falsity, detrimental reliance on its truth and right to rely thereon. *Crues v. KFC Corp.,* 729 F.2d 1145, 1148 (8th Cir.1984); *Cantrell v. Superior Loan Corp.,* 603 S.W.2d 627, 634 (Mo.Ct.App.1980). In determining whether Morrill made a submissible case of fraud we must view the evidence in the light most favorable to the jury verdict. *Walsh v. Ingersoll-Rand Co.,* 656 F.2d 367, 369–70 (8th Cir.1981).

 Although the evidence at trial clearly established misrepresentations of fact made by B–D in its royalty statements over the years as to sales and classification of products, which resulted in under-reporting of royalties due Morrill, we hold that the evidence was not sufficient to establish B–D's knowledge and intent with respect to all of these inaccuracies. Morrill's own witness, B–D's former attorney who testified on Morrill's behalf as to the meaning of the agreements, gave unrefuted testimony that several of the reporting accuracies were honest mistakes.

 We hold, however, that there was sufficient evidence from which a jury could conclude that other statements, including reporting Morrill's Unopette royalties at under the $5,000 yearly minimum, basing Unopette royalties on the net selling price attributable to the capillary tube component only, and assigning the 1961 1% rather than the 1970 5% rate to various products were misrepresentations of fact made with the requisite knowledge and intent. Morrill's exhibits at trial included internal B–D memoranda dated November 1968 and September 1969, in which B–D's law department stated that Unopette royalties were payable on the entire Unopette product and not limited to the relative sales price of the capillary tube component. Nevertheless, in January 1969 B–D decided to continue paying Morrill the minimum royalty, even though it knew that Unopette sales were generating more than $5,000 per year in royalties, and adopted the plan of pro-rating royalties based on the sales price of the capillary tube component. In an internal memorandum dated April 2, 1970, B–D decided to adopt the position that

---

3. Although Morrill's complaint alleged that B–D breached its fiduciary duty, this issue was not submitted to the jury. Because we hold that Morrill made a submissible case of fraud thereby supporting tort liability and punitive damages, we need not decide whether B–D breached a fiduciary duty as a matter of law. For a case allowing tort and punitive damages to a patent licensor for licensee's breach of confidential relationship, as well as contract damages for unpaid royalties, see *Crutcher-Rolfs-Cummings, Inc. v. Ballard,* 540 S.W.2d 380 (Tex.Civ.App. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

"this royalty interpretation is the intent of the contract and we can apply it without notifying Vaughan [Morrill] or taking any other steps." Especially indicative of B–D's knowledge and intent was its decision not to inform Morrill of its "reinterpretation" of its agreement with him.

Evidence at trial also included B–D memoranda surrounding its 1980 decision to apply the 1961 agreement's 1% rate rather than the 1970 agreement's 5% rate to certain products. In early 1980, B–D was concerned about the prospect of paying sizable royalties on two new products, Clinical Thermometer glass tubing and QBC tubing. A top management internal letter dated March 27, 1980, stated: "We do not wish to pay 5% on B–D Clinical Thermometer tubing or QBC. Without a negotiation with V.M., we are obliged to pay 5% on total net trade sales and this could be 5% of $24 million in 1983."

Furthermore, B–D discovered that due to an oversight it neglected to pay Morrill royalties since 1976 on certain new catalog items. The underpayment was calculated at $14,000 to $50,000 depending upon the royalty rate to be applied. A memorandum dated May 2, 1980, summarized B–D's decisions on how to handle these concerns:

(1) Those catalog numbers previously paid at 5% will continue at that rate

. . . .

(2) The back payment due V. Morrill, because of an oversight of new catalog numbers since 1976 shall be paid at the regular rate of 1% of net sales.

(3) From this day on, royalty will be paid at 1% of net sales on all new products and catalog numbers—regardless of configuration.

It was also agreed that we would not formally indicate, in writing, that we are modifying our position with regard to royalty or that a contract allows such a modification. We agreed that we would just implement the appropriate royalty payments and merely indicate, in general, the reasons for back payments (oversight) and institution of new payments (new products).

We believe that the foregoing evidence goes to actions beyond mere breach of contract and is sufficient to support the jury findings of B–D's knowledge that certain misrepresentations were false and intent that Morrill act upon them in the manner reasonably contemplated.

■ We further hold that there was sufficient evidence to support jury findings that Morrill relied on these misrepresentations in accepting the royalty payments and that in so relying, Morrill used ordinary care.[4]

Morrill testified that he relied on B–D's accuracy and good faith in reporting royalties due him, that he questioned B–D about the completeness and accuracy of Unopette royalty statements and relied on B–D's responses and assurances, that his repeated requests for additional information were inadequately answered, and that his ability to detect improper reporting of the 1% royalty was hindered by B–D's reporting methods. Exhibits at trial included skeletal royalty statements which failed to provide information concerning quantity and net sales of the various products sold.

B–D argues that full information was reasonably available to Morrill and that he could have discovered the misrepresentations by asserting his right under the agreements to inspect B–D's books and records.

■ In Missouri, the trend in modern cases is to require less diligence, rather than more, in persons to whom representations are made and to condemn the falsehood of the person making the representation, rather than the credulity of the victim. *Cantrell v. Superior Loan Corp.*, 603 S.W.2d at 637; *Shechter v. Brewer*, 344 S.W.2d 784, 788 (Mo.Ct.App.1961). The op-

---

**4.** The jury was instructed that in order to find in favor of Morrill on the fraud claim it must find that in relying on B–D's representations, Morrill used "that degree of care that an ordinary and prudent person would use under the same or similar circumstances." This instruction on right to rely follows Mo. Approved Instructions 3d 23.05.

portunity for investigation will not of itself preclude the right of reliance. *Tietjens v. General Motors Corp.*, 418 S.W.2d 75, 82 (Mo.1967); *Meyer v. Brown*, 312 S.W.2d 158, 161 (Mo.Ct.App.1958). B–D's argument at best establishes that there was conflicting evidence on Morrill's right to rely. The evaluation of this evidence was for the jury and we see no ground for reversing its determination of this factual question. We thus conclude that, under the particular facts of this case, a submissible case of fraud, independent of the breach of contract, was established.

### Amount of actual damages

B–D argues that the jury awards of actual damages cannot stand because they were irrational, excessive and inconsistent. Specifically, B–D argues (1) that the evidence did not support an award under either count in excess of $1,955,470, the amount of unpaid royalties due under the agreements according to Morrill's calculations, and (2) that the amount of damages should have been the same under each count.

 We hold that the award of damages for breach of contract in the amount of $2,125,000 was fairly supported by the evidence. There was evidence that Morrill's calculations were conservative and that B–D's practices prevented Morrill from calculating the royalties actually due with absolute precision. We believe, however, that there is merit to B–D's challenge to the actual damages award to the extent that it exceeds $2,125,000. Under the measure of damages instruction on the fraud claim,[5] the jury could not have found damages in excess of the contract damages. Thus the district court erred in reducing the $3,000,000 fraud award by the $2,125,000 contract award and allowing Morrill to recover a total of $3,000,000. Rather, because in this case the award under the contract claim and the award

under the fraud claim represent a duplication of damages, Morrill should have been limited to recovery of $2,125,000. *See Central Microfilm Service v. Basic Four Corp.*, 688 F.2d 1206, 1213 (8th Cir.1982), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983). We do not believe that the inconsistency between the two jury awards requires retrial.

### Statute of limitations

 B–D argues that the Missouri statute of limitations, Mo.Rev.Stat. § 516.-120(1), (5) (1978), which provides for a five-year limitations period for contract and fraud claims, bars recovery under either theory for royalties due more than five years prior to suit. We hold that the district court properly relied on Mo.Rev.Stat. § 516.100 in rejecting B–D's statute of limitations claim. This section provides that the applicable statute of limitations for a claim

> [s]hall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

*See Smith v. Smith, Barney, Harris, Upham & Co.*, 505 F.Supp. 1380, 1391 (W.D. Mo.1981).

### Amount of punitive damages

B–D's final point on appeal is that the punitive damages award is excessive and the result of improper and prejudicial argument, and that the district court therefore erred in not granting B–D's motion for a new trial.

 We recognize that the amount of a punitive damages award is a decision which rests peculiarly within the discretion of the jury, *Ogilvie v. Fotomat Corp.*, 641 F.2d

---

5. The jury was instructed that if it found in favor of Morrill on his fraud claim, then it must award Morrill such sum as it believed was the difference between the amount of the royalties

B–D represented as due and paid to Morrill and the amount of the royalties which it believed that B–D should have paid to Morrill.

581, 587 (8th Cir.1981); *Wisner v. S.S. Kresge Co.*, 465 S.W.2d 666, 669 (Mo.Ct. App.1971), and that excessiveness of a verdict is basically a matter for the trial court, *Bankers Life & Casualty Co. v. Kirtley*, 307 F.2d 418, 423 (8th Cir.1962). The trial court's determination that a new trial should not be granted on the ground of excessive punitive damages will not be upset on appeal unless the jury award would result in plain injustice, or a "monstrous" or "shocking" result. *Id.*

 Keeping in mind all the relevant factors in reviewing a punitive damage award, *see Wisner v. S.S. Kresge Co.*, 465 S.W.2d at 669–70, we hold that the award of $20,000,000 in the present case is excessive and cannot stand. We do not believe, however, that the contract and fraud liability determinations and awards of actual damages were tainted and that a new trial need be ordered. Under the circumstances, remittitur is the proper remedy. *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1177–78 (10th Cir.1981), *cert. denied*, —— U.S. ——, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2820 (1973). Accordingly, we require a remittitur to reduce the punitive award to $3,000,000 for the judgment to stand. If Morrill declines to accept a reduced judgment, there should be a new trial on the issue of punitive damages.

*Attorney's Fees*

 On cross-appeal Morrill argues that the district court erred in denying his motion for attorney's fees as compensation for B–D's bad faith conduct in filing three counterclaims against Morrill, all of which were dismissed on B–D's motions prior to or during trial. Although a court may assess attorney's fees when the losing party has acted "vexatiously, wantonly, or for oppressive reasons," *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974), this is a matter within the trial court's discretion, and we find no abuse of discretion here.

Accordingly, we remand this case to the district court with directions that if, within a reasonable time to be fixed by the district court, Morrill accepts a reduction of the punitive damages award to $3,000,000, a total judgment of $5,125,000, with interest as provided in and accruing from the original judgment, shall be entered and affirmed. If the remittitur is not accepted, the award of punitive damages shall be reversed and a new trial ordered on that issue. The district court's denial of Morrill's attorney's fees is affirmed. The district court's injunction against B–D is also affirmed.